Filed April 14, 1896.

---

No. 17,726.

DENNEY, CLERK, ET AL. *v.* THE STATE, EX REL. BASLER.

APPORTIONMENT. LAW.—*Power of Courts to Pass Upon Constitutionality Of.*—An unconstitutional apportionment law may be declared void by the courts notwithstanding the fact that such statute is an exercise of political power.

SAME.—*When Apportionment May Be Made.*—A valid apportionment law can be passed only once for each enumeration period under our State Const., article 4, section 4, providing for an enumeration every six years, and section 5 requiring an apportionment at the session next following the enumeration,

SAME.—*Unconstitutional.*—*Declared Valid by Lower Court.*—*Not Binding on Legislature.*—An unconstitutional apportionment law,

Denney, Clerk, *et al. v.* The State, *ex rel.* Basler.

even if it has been declared constitutional by one of the lower State courts, will not preclude the enactment by the legislature of a valid apportionment law.

SAME.—*County and Proportionate Representation.— Review by Courts.*—The approximation to the dual constitutional requirements of county representation and proportionate popular representation in the enactment of an apportionment law by the legislature is not reviewable by the courts except for gross abuse of discretion, and providing both objects contemplated in the constitution are kept in view.

SAME.—*Legislative District.*—The requirement that legislative apportionment shall be according to the number of inhabitants, in State Const., article 4, section 5, is no less binding than the provision that counties united in a district must be contiguous, or that no county for senatorial apportionment shall be divided.

SAME.—*Double District.*—Double districts in which two or more counties are grouped and given a voice in the election of more than one senator or representative when neither of them has a voting population equal to the ratio for one senator or representative cannot be created under our State Const., article 4, section 5, requiring apportionment among counties according to the male inhabitants above twenty-one years of age, and section 6 providing that where more than one county shall constitute a district they must be contiguous.

SAME.—*Constitutional Requirement.—Observance Of.*—The obligation of observing a constitutional requirement as nearly as possible in an apportionment act becomes of binding force under the constitution when the exact requirement cannot be observed.

SAME.—*Equality of Representation.*—The injustice of allowing but one representative to a county while other counties having a similar population are given a voice in the election of more than one representative must be avoided whenever possible.

SAME.— *Validity Of.—Estoppel.*—The people of the State cannot be estopped from asking for a determination of the validity of an apportionment law by failing to bring the matter to a decision until after a legislature has been chosen in pursuance of the act. *53⁹*

JUDICIAL NOTICE.—*Of Records in Another Case.*—The court can take notice of its own records in another case, either on suggestion of counsel or upon its own motion.

SAME.—*Of Census or Enumeration.—Legislative District.*— Judicial notice will be taken of a census or other enumeration made under the authority of the State or United States, and also of the location, boundaries and juxtaposition of the several counties of the State.

Denney, Clerk, *et al. v.* The State, *ex rel.* Basler.

JUDGMENT.—*Res Adjudicata.*—*Constitutionality of Statute*—A judgment in an action brought by an individual is not conclusive in a subsequent action to which he is not a party nor even a relator, although both cases turn on the constitutionality of the same statute.
COURTS.—*Stare Decisis.*—*Maxim.*—The rule of *stare decisis* does not bind the court in deciding the constitutionality of a statute where no property right or contract between the parties is involved.

### From the Sullivan Circuit Court.

*Harris & Douthitt, Miller, Winter & Elam, M. E. Forkner, W. A. Ketcham,* Attorney General, *A. W. Wishard* and *Bynum & Rooker,* for appellants.

*D. Turpie, B. K. Elliott, J. B. Brown, J. E. Lamb, J. T. Beasley, A. G. Smith* and *C. A. Korbly,* for appellee.

HOWARD, J.—This was an action brought by the appellee to enjoin the appellants, as clerk of the circuit court, sheriff, and auditor of Sullivan county, from proceeding in their several official capacities to hold the election for 1896, for the election of senators and representatives in the general assembly, under or pursuant to the provisions of the apportionment act of 1895; and for a writ of mandate to compel said officers to proceed to hold said election for senators and representatives under the apportionment act of 1893.

The material allegations of the complaint are, that the appellee's relator is a citizen, tax payer and voter of said county, and appellants are the proper officers to give notices and furnish forms and ballots and take other steps for the holding of general elections in said county; that the general assembly of 1891, that being the proper time therefor, passed an apportionment act for the election of members of the general assembly, which act was afterwards declared unconstitutional by the Supreme Court; that afterwards the

general assembly of 1893 passed an apportionment act, which is still in force and is the only valid law on that subject; that in 1895 the general assembly passed another apportionment act, which is unconstitutional; and, at the same time, by a second act, repealed the apportionment act of 1893, which repealing act is also unconstitutional and void; that by the act of 1893 said Sullivan county was entitled to one representative in the general assembly, and, conjointly with Vigo and Vermillion counties, was entitled to one additional representative, which said provision was useful and beneficial to said relator; that by the pretended act of 1895 Sullivan county is entitled to but one representative in the general assembly, and the relator is thereby deprived of the rights, privileges and benefits of said act of 1893; that before bringing this action said relator made demand of appellants that they proceed under and in accordance with the apportionment act of 1893 in performing their duties in regard to the election of senators and representatives at the general election in November, 1896; but that appellants refused so to act, and asserted that they would proceed under the said apportionment act of 1895; and that the appellants will so proceed unless enjoined therefrom, and will, unless commanded so to do by the court, fail, neglect and refuse to proceed under and in accordance with the act of 1893, to the great and irreparable damage of appellee's relator. It is further expressly alleged that the provisions of the act of 1893 "are constitutional and valid enactments;" and that the act of 1895 "is unconstitutional, fraudulent, abortive, void, and of no validity or effect for any purpose whatsoever."

The prayer was that injunction and mandate might issue. There was a waiver by appellants of service of process, and of the issuing of an alternative writ of

mandate; and thereupon they tendered their demurrer to the complaint, which was overruled.    Appellants refusing to plead further, the court entered judgment against them upon the demurrer.    By the terms of the decree the appellants were enjoined from proceeding for the election of senators and representatives under the apportionment act of 1895; and were commanded to exercise their official duties in relation to said election under the provisions of the act of 1893.

The overruling of the demurrer to the complaint is the only error assigned on the appeal.

Appellee asserting the invalidity of the apportionment act of 1895, and also of said repealing act, and asserting the validity of the act of 1893, and asking for an injunction against the enforcement of the former, with a mandate compelling an enforcement of the latter, it becomes necessary, in order to decide what, if any, relief appellee is entitled to, first to determine the constitutionality of the act of 1895.    If that is found to be a valid law, the case is at an end, for the appellee is not entitled to any relief.    If, however, the act of 1895 should be found invalid, then it would become necessary to determine the constitutionality of the act of 1893 ; for, unless the act of 1893 should be found constitutional, the appellee would not be entitled to the writ of mandate in favor of its enforcement, even though the appellee might be entitled to have an injunction against the enforcement of the act of 1895.

The first reason given for the demurrer is, that the court has no jurisdiction over or of the subject matter of the action.

The basis for this contention is, that the making of an apportionment for membership in the general assembly is an exercise of political power, which has been committed by the people to the wisdom of the

legislative branch of the State government; that the courts may not therefore interfere with the exercise of this power by the general assembly. .

This, no doubt, speaking in broad terms, is true; but only to the extent provided by the people in framing the constitution. The courts cannot say how an apportionment shall be made, nor even whether any apportionment shall be made. The province of a court, however, is to say what the law is. If, then, a law is enacted, and its validity is brought in question, in a proper proceeding, and before a court of competent jurisdiction, the court must render judgment. That is the proper and necessary function of a court.

The sole standard by which the validity of a law is to be tested, is the fundamental law of the land. The constitution is the supreme law, to be respected alike by legislators and by courts. The people, through their constitution, having thus set up the courts as the tribunals to pronounce upon the validity of all laws, and having made the constitution itself the standard by which such laws shall be tested, the courts must determine whether any given law is in conflict with the constitution or not. They have no choice in the matter, but must pronounce judgment. And it can make no difference what the law may be. An apportionment law that violates the constitution must be held invalid, quite the same as any other. The question is not, what is the character or subject of the law, but whether it is in conflict with the constitution.

In recent years the validity of apportionment acts has been before the courts of last resort in at least four States besides our own. In two of these cases, in Wisconsin and Michigan, the courts held the acts unconstitutional; in the other two cases, in New York and Illinois, the acts were held constitutional; but in all four cases, as well as in this State, the courts, with-

out hesitation, assumed jurisdiction of the subject matter of the controversy.  *State, ex rel.,* v. *Cunningham,* 81 Wis. 440 (15 L. R. A. 561), and *Ib.,* 83 Wis. 90 (17 L. R. A. 145); *Board of Superv's* v. *Blacker,* 92 Mich. 638 (16 L. R. A. 432); *Giddings* v. *Blacker,* 93 Mich. 1 (16 L. R. A. 402); *People, ex rel.,* v. *Rice,* 135 N. Y. 473 (16 L. R. A. 836); *Parker* v. *State, ex rel.,* 133 Ind. 178 (18 L. R. A. 567); *People, ex rel.,* v. *Thompson,* 155 Ill. 451.  See, in particular, the forcible argument of Elliott, J., in his concurring opinion in *Parker* v. *State,* here cited.

In *State* v. *Cunningham, supra,* citing *Houston* v. *Moore,* 18 U. S. 1, the power and duty of American courts to determine the constitutionality of all laws is asserted in this clear and vigorous language:  "By a course of judicial decisions, reaching from the earliest history of American government to the present day, without a dissenting voice, it has been adjudged that courts of justice have the right and are in duty bound to test every law by the constitution as the fundamental and paramount law of the land, governing all derivative power and the exercise thereof.  The judicial department, with us, is the proper power under the constitution to declare the constitutionality of a law; and every act of the legislature contrary to the true intent and meaning of the constitution will be declared by the courts null and void, and of no effect whatever."

In so far, then, as an apportionment law violates the provisions of the constitution, it will, as in the case of any other act of the legislature, be declared void.  It need hardly be said, however, that in so far as the constitution itself has made the apportionment of the State discretionary with the legislature, that discretion, as in any other case, will be scrupulously respected by the courts.  Yet more, since the subject

of apportionment is, in general, in charge of the legislative department of the government, wherever there is no positive injunction in relation to this matter laid upon the general assembly by the constitution, there also the courts will refrain from substituting their discretion in place of the discretion of the legislature.

Where, however, the constitution has spoken, and the voice of the legislature is heard in conflict with this voice of the constitution, then the courts will interfere, and will sustain the paramount law of the land as against its violation by the legislature. And to determine whether, in any given case, the constitution has been violated by an act of the general assembly, the courts will always take jurisdiction, whether the act be one for legislative apportionment or for any other purpose.

The remaining reason given for the demurrer is, that the complaint does not state facts sufficient to constitute a cause of action against appellants.

The main question in the case, as made by the pleadings, and as discussed by counsel in their briefs and in the oral argument, arises under this head, namely: Whether, under the constitution, any apportionment act could be passed at the time when the alleged apportionment law of 1895 was enacted.

The appellee contends that, since the constitution has fixed a time, once in six years, when an enumeration of the voters of the State shall be taken, and an apportionment of senators and representatives made by law, there is thereby created a limitation upon the power of the legislature to make such apportionment at any other time.

The appellants argue, on the contrary, that, since the making of an apportionment is an exercise of political power, and hence committed to the legislative department in the general grant of power to that

department, therefore the legislature may exercise this function at any time; and that the provisions of the constitution requiring the enactment of an apportionment law at the beginning of each period of six years were inserted in the fundamental law so that such apportionment should be made at least once in six years, but were not intended as a prohibition upon the general assembly from making other apportionments as often as that body might deem best.

This question, we think, notwithstanding the elaborate and able arguments of counsel for appellants, must be decided in favor of the contention of appellee.

It is provided in section 1, of Article 4, of the constitution, that "The legislative authority of the State shall be vested in the general assembly, which shall consist of a senate and a house of representatives."

If there were no particular provisions in the constitution in regard to the subject of legislative apportionment, there is little doubt that, under the foregoing full and unrestricted vesting of legislative power in the general assembly, that body might, in its discretion, and at any time, enact laws for the apportionment of its members among the several counties or other districts of the State; or might, perhaps, provide that all the members of the legislature should be chosen by the people at large.

But section 4, of the same article, provides, that "The general assembly shall, at its second session after the adoption of this constitution, and every six years thereafter, cause an enumeration to be made of all the male inhabitants over the age of twenty-one years."

And section 5, of said article, contains the following provision: "The number of senators and representatives shall, at the session next following each period of making such enumeration, be fixed by law, and ap-

portioned among the several counties, according to the number of male inhabitants above twenty-one years of age in each."

We think the legitimate and necessary conclusion to be drawn from these two sections is, that an enumeration of the voters shall be taken once every six years; and that, upon such enumeration as a basis, the apportionment of members of the legislature shall be made at the next ensuing session of the general assembly, and only then.

Otherwise, and as said by this court in *Parker* v. *State, ex rel., supra,* "Unless the general assembly is to be governed by the enumeration, when made, in the matter of districting the State for legislative purposes, the enumeration is a useless ceremony, and an unnecessary expense. The purpose in requiring the enumeration is to fix the number of voters in each county at the time the apportionment is made, in order that the legislature may form districts so as to secure to each voter, as near as may be, an equal voice with every other voter in the State, in the selection of senators and representatives. * * * The enumeration, at the short period of six years, was intended to secure a readjustment and correction of the inequalities that might arise from the growth or shifting of the population within that period."

In case, then, there is in existence a valid apportionment law, and one passed within the proper enumeration period, it may be confidently affirmed that an attempt to make another apportionment, and at a time further removed from the time of taking the enumeration, is a violation, not only of the spirit, but of the letter of the constitution, all of whose provisions are mandatory, unless by their own terms made directory, or simply permissive.

The fixing, too, by the constitution of a time and a

mode for the doing of an act, is, by necessary implication, a forbidding of any other time or mode for the doing of such act. So it was held in *Morris* v. *Powell,* 125 Ind. 281 (9 L. R. A. 326): "When the constitution commands how a right may be exercised, it prohibits the exercise of that right in some other way." Citing Cooley Const. Lim., 64. See also the *Town of Williamsport* v. *Kent,* 14 Ind. 306; *City of Evansville* v. *State, ex rel.,* 118 Ind. 426; *Page* v. *Allen,* 58 Pa. St. 338 (98 Am. Dec. 272).

It follows, then, that counsel are in error when they argue that because the legislature is not expressly forbidden to pass an act of apportionment at a time different from the time fixed for that purpose, therefore it may, by virtue of its general power to legislate, enact apportionment laws whenever it pleases.

The constitution of the State of Wisconsin, in its provisions for enumeration and apportionments, directs that, "at their first session after such enumeration, and also after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants."

It was said by the Supreme Court of that State, in *Slauson* v. *City of Racine,* 13 Wis. 444: "In our constitution there is no express prohibition against an alteration of assembly districts. And whatever limitation exists upon the power of the legislature in that respect, is to be derived from the general scope and objects of the provisions of the constitution concerning the apportionment of senators and representatives. But it may well be said that these furnish such a limitation, and that when the instrument provides for an apportionment and organization of districts once in five years, this implies that it shall not be done at any

other time. This would seem clear with respect to a general apportionment; and perhaps the same implication would extend to any particular reorganization of assembly or senate districts, by any law passed directly for that purpose."

Under our constitution, an enumeration is provided for every six, instead of every five years; and the implication that an apportionment law can be passed only once for each enumeration period, thus found by the Supreme Court of Wisconsin to be necessarily drawn from the words of the constitution of that State, must also be drawn from the like words of our own constitution.

Since the constitution thus provides that an enumeration of the voters of the State shall always be made as preliminary to the enactment of an apportionment, it is evident that the theory of the framers of the constitution was, that a valid apportionment can be made only after the taking of such enumeration; and that when such valid apportionment is once made, it should stand until after the making of the next enumeration. They did not, of course, contemplate the enactment of an invalid apportionment, or one made in violation of the letter and spirit of the constitution. If, however, a valid apportionment were once made, it could not be made over again. Being a valid apportionment, to change it before another enumeration of the voters could but result in an invalid apportionment. Hence it was provided that enumeration and apportionment should go together, the one to be the complement of the other. When the enumeration should be taken, and the consequent apportionment made, the work would be complete; and would not, therefore, be repeated, in whole or in part, until the succeeding six-year period should come,

when the dual work should again be done.

But counsel for appellants say, that, even if it be true that an apportionment law can be passed but once for each enumeration period, yet if no valid law has, in fact, been enacted, the continuing duty to pass such a law at the earliest time practicable, always rests upon the law-making power, until such valid apportionment is finally made. *People, ex rel.,* v. *Rice, supra.*

Counsel say, further, that the last enumeration was taken in 1889; that at the next session of the general assembly thereafter, in 1891, an apportionment law was passed; that this law was adjudged unconstitutional by this court. *Parker* v. *State, ex rel., supra.* That thereafter, in 1893, the legislature passed another apportionment law; that this apportionment law of 1893 was invalid for the same reasons for which the act of 1891 was held invalid; that the legislature of 1895 found this invalid act of 1893 upon the statute book, declared it unconstitutional and repealed it, and then passed the act of 1895, now under consideration; that the act of 1893 being unconstitutional, it was as if no apportionment law was in existence, therefore the continuing duty of enacting a valid apportionment law rested upon the legislature of 1895; and hence the act of 1895 was passed at a proper time, and is valid and constitutional.

Whether the legislature of 1895 had authority to enact an apportionment law must depend, as we have already seen, upon the fact as to whether there was then in existence a valid apportionment law, passed within the current enumeration period. That legislature could not by any act of its own create the necessity for the enactment of another law on the subject, as by repealing the law already in existence. If the apportionment act of 1893 were indeed a valid law, it

could not be repealed by the legislature of 1895. For, in case of the validity of the act of 1893 it would most certainly have been unlawful to enact any other apportionment law until the next enumeration period; and the legislature could not change this condition by an attempt to repeal such valid apportionment to make room for another law on the subject. Such further law on the subject would have been premature, and out of due time as fixed by the constitutional mandate. The repealing act, therefore, which was passed in 1895, as preliminary to the enactment of the apportionment law of that year, was itself either a violation of the constitution, or else a vain and useless act, being the repeal of an invalid law.

But if the legislature of 1895 could not repeal a valid apportionment law passed in 1893, the question still arises whether the Legislature of 1895 could in any case pass an apportionment law? It certainly had the power to do so if there were at that time no valid apportionment law in existence, if the act of 1893 were in fact an unconstitutional law.

The ordinary and proper course to be taken to determine whether the act of 1893 was unconstitutional or not, was, as in other cases, to apply to the courts. These tribunals were open for the consideration of the validity of this, as of any other act of the legislature. As it is the province of the legislature to enact laws, and of the executive to enforce them, so it is of the courts to determine their. validity. This would have been the fitting course, rather than to have the legislature itself cry out against the good faith of its predecessor, and to declare against the constitutionality of the very law under which it was itself elected.

In this .case the indelicacy of the legislative criticism of a preceding legislature is the more marked when we reflect that, as shown by the files of this

court in the case of *Wishard* v. *Lenhart,* No. 17,385, appealed from the Marion Circuit Court, that court had already found the act of 1893 to be a valid and constitutional law.    It would have been more seemly, as well as more effective, to have pressed that case to a final hearing, rather than to have acted in defiance of the decision already rendered by the circuit court.

Some question having been made as to whether we can thus take notice of other records in this court, in considering a case at bar, we may here remark that we have no doubt that this may be done, whether the court make such inspection of its own motion or on the suggestion of counsel.    See *Washington, etc., R. R. Co.* v. *D'Alene Ry., etc., Co.,* 160 U. S. 77.

But, apart from any consideration of propriety, the question recurs, could the legislature of 1895 assume to determine for itself the constitutionality of the act of 1893, and, on such assumption of responsibility, proceed to pass another act of apportionment, leaving to the courts to pronounce finally upon the question as to which of the two acts was constitutional?

We have no doubt that the legislature of 1895 had this power.    The members of that body took the oath taken by all those who perform official duties, namely: that they would support the constitution.    If those legislators believed, under their oaths, that there was no valid apportionment law in existence based upon the last enumeration, it was their solemn duty to pass such a law.    Their enactment of such a law was in itself, in effect, an appeal to the courts to decide whether they were mistaken or not, and to say which of the acts, if either, was the valid and constitutional law of the State.

"Every department of the government," says Judge Cooley, in his Const. Lim. (4th ed.), Chap. IV., "and every official of every department, may, at any time,

when a duty is to be performed, be required to pass upon a question of constitutional construction."

And again, in the same connection, he says: "We shall find the general rule to be, that whenever an act is done which may become the subject of a suit or proceeding in court, any question of constitutional authority that was raised, or that might have been raised, when the act was done, will be open for consideration in such suit or proceeding; and that, as the courts must finally settle the controversy, so also will they finally determine the question of constitutional law."

It may be admitted, then, that, as both the act of 1895 and that of 1893 are before the court as acts of the legislature, in due form and duly authenticated, and the constitutionality of both is questioned, we must determine the validity of each. If on such examination one act is found valid and the other invalid, the case is ended; so also if both are found invalid. If, however, both acts should, in all respects, except as to the date of enactment, be found to comply with the constitutional requirements, then it would follow, from what we have heretofore said, that the act of 1893 being in itself a valid apportionment law, the legislature in 1895, or at any other time prior to the next enumeration, could have no warrant under the constitution to enact another apportionment law; and the act of 1895 would, for that reason alone, be void. While the act of 1893, being valid, would, during the enumeration period when it was passed, and until the passage of a valid apportionment act after the ensuing enumeration, be the sole law upon the subject of apportionment.

It therefore becomes necessary, apart from any question as to the time of the making of either appor-

tionment, to determine the constitutionality of the act of 1895, and also of the act of 1893.

By section 4, of Article 4 of the constitution, as we have seen, an enumeration of the voters of the State is to be taken once every six years.

The ensuing sections, 5 and 6, of the same article, provide for apportionment, as follows:

"Sec. 5.   The number of senators and representatives shall, at the session next following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the number of male inhabitants above twenty-one years of age in each:   Provided, That the first and second elections of members of the general assembly, under this constitution, shall be according to the apportionment last made by the general assembly before the adoption of this constitution.

"Sec. 6.   A senatorial or representative district, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for senatorial apportionment, shall ever be divided."

It is clear from these sections, that, in providing for an apportionment of members of the general assembly, two main objects were kept in view by the framers of the constitution:   One being local county representation; the other, proportionate representation of all the people.   The counties, as governmental subdivisions of the State; and the inhabitants, according to their number in each county, were to be represented.   The striking and comprehensive language of the constitution is:   "The number of senators and representatives shall   *   *   *   be fixed by law, and apportioned among the several counties, according to the number of male inhabitants above twenty-one years of age in each."

Either of these objects, county representation, or proportionate popular representation, might be attained in perfection, were it not for the necessity of also attending to the other object; but the design was that neither be neglected or sacrificed for the other. The most exact proportionate representation would be secured by making a single district of the State, and electing all the members by the people at large. Each voter would thus have his absolute and equal weight with every other voter in selecting the members of the general assembly. But, besides resulting in the admitted evil of making the general assembly solidly of one political party, at least so far as elected at the same time, and thus wholly stifling the voice of the minority, this exactness of proportionate representation would also be attained at the total sacrifice of local county representation. On the other hand, if county representation only should be considered, then proportionate representation of population in large and in small counties would be wholly lost sight of.

To secure the fullest possible local county representation, with the nearest proportionate representation of the voters in each county, is the approximate result to be reached from these two requirements of the constitution. The working out of this approximation is a practical problem to be left to the patriotism and good judgment of the legislature, and hence not reviewable by the courts, except for gross abuse of discretion, and provided only, that both objects contemplated in the constitution be kept in view in the law enacted by the general assembly. *People* v. *Thompson, supra.*

By section 3, of Article 4 of the constitution, it is provided that senators shall be elected for a term of four years, and representatives for a term of two years, from the day next after their general election.

And, in section 3, of Article 15, it is declared that whenever, either in the constitution or in any law thereunder, it is provided "that any officer, other than a member of the general assembly, shall hold his office for any given term, the same shall be construed to mean that such officer shall hold his office for such term and until his successor shall have been elected and qualified."

Construing these two provisions of the constitution together, it is apparent that the members of the general assembly remain in office only during the terms for which they were elected. Senators can, under no circumstances, hold office after four years, nor representatives after two years, from the day next after their general election.

So jealous were the people, in framing the constitution, of the possible usurpation of power on the part of the legislature that they thus expressly excepted members of the general assembly from that provision according to which all other officers are authorized to hold their offices until their successors are elected and qualified.

But while the general assembly is thus prevented from any attempt at perpetuating its existence by extending the terms of office of its members; yet there would be but little thus gained or saved to the people if the legislature might, through an unequal apportionment, perpetuate its power by ensuring the re-election of its members or the election of new members who should be in sympathy with those who thus engaged in usurping and perpetuating power against the will of the majority of the people.

The principle of proportionate representation has always obtained in Indiana, even from a time preceding the formation of the constitution of the United States. From the passage of the ordinance for the

government of the Northwestern Territory, July 13, 1787, out of which territory our commonwealth was afterwards formed, this principle of proportionate representation has been of the very essence of our local self-government. The ordinance of 1787 names proportionate representation in the same category with the writ of habeas corpus, trial by jury, and due process of law, as fundamental rights to which the people of this territory shall always be entitled.

On the formation of our State government, in 1816, the constitution then adopted retained, in Article 3, the same principle of proportionate representation, based upon an enumeration of the inhabitants every five years. Finally, on the adoption of the present constitution, in 1851, the principle was still continued. So that, for over one hundred years, the unvarying law of this territory and State has been, as affirmed by the fathers of 1787, "The inhabitants of said territory shall always be entitled to the benefit of   *   *   .*   a proportionate representation of the people in the legislature."

It is true that the ordinance of 1787, and the constitution of 1816, are no longer in force, only in so far as provisions of those instruments have been retained in our present constitution. The principle of proportionate representation in the legislature has, however, been so retained, and, consequently, has been the law here during the whole period covered by those three charters of free government in Indiana.

It is provided in the second section, of Article 1 of the constitution of the United States, that "The number of representatives shall not exceed one for every thirty thousand; but each State shall have at least one representative." Under the first census, Congress, in obedience to this provision of the constitution, fixed the number of representatives at one hundred and

twenty. By this apportionment, Massachusetts was entitled to fifteen representatives, with an excess of 25,327, for which an additional representative was given. Other States, also having large fractions of population left after supplying their respective quotas of representatives, based on the given ratio, were each awarded an additional representative; while States having but a small excess were each denied an additional representative. President Washington, with the advice of Jefferson, Madison and others, vetoed the bill, as in violation of the constitutional provision, above set out, that "the number of representatives shall not exceed one for every thirty thousand."

The exact mathematical rule of apportionment, thus insisted upon in the beginning, proved unsatisfactory, inasmuch as it resulted in leaving a number of representatives unassigned, owing to the fractions of population left unrepresented after filling the quotas to which the several States were entitled by reason of their full ratios of representation.

The question continued to trouble Congress until 1832, when the rule adopted was, that after each State was given one representative, and also the full number to which it should be entitled by reason of its population, being one representative for each ratio, the remaining representatives should be assigned, one each to those States having the largest fractional remainders of population. This has since continued to be the law.

In advocacy of the rule of approximation thus adopted, Mr. Webster, then in the United States Senate, said: "The constitution therefore must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment

of representatives among the several States according to their respective numbers, as near as may be. That which cannot be done perfectly, must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule merely because the rule of perfect justice cannot be applied. In such a case, approximation becomes a rule; it takes the place of the other rule, which would be preferable, but is found inapplicable, and becomes itself an obligation of binding force."

The constitution of this State, like that of the United States, provides for an absolute rule of apportionment; not, as in some of our sister States, that the apportionment shall be "as nearly as may be," or "as nearly as practicable," according to the inhabitants of each county; but that it shall be, simply, "according to the number of male inhabitants above twenty-one years of age in each." Much, therefore, of what is said by the Court of Appeals of New York and the Supreme Court of Illinois, in *People* v. *Rice,* and *People* v. *Thompson, supra,* as to the discretion of the legislature in making apportionments, is inapplicable to the case before us.

Our constitution requires that legislative apportionment shall be according to the number of inhabitants; and that requirement is quite as binding as the injunction that a district formed of two or more counties "shall be composed of contiguous counties," or that "no county, for senatorial apportionment, shall ever be divided." One mandate of the constitution must be respected as well as another; and, as Webster said, if the mandate cannot be absolutely obeyed, it should be observed at least as nearly as may be. "The nearest approximation to exact truth or exact right,

when that exact truth cannot be reached, prevails in other cases, not as matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind."

While it is true, therefore, as already said, that the legislature has, and in the nature of things must have, large discretion in making an apportionment; yet, as held in *Parker* v. *State, ex rel., supra,* "it cannot be successfully maintained that the incumbents of any department of government have a discretion to disregard the constitution of the State. * * * It is safe to say, that where the act of either of the three departments is in violation of the constitution of the State, such act is not within the discretion confided to that department."

Considering, then, the act of 1895 in the light of these principles, the main objection urged against it is what are called the double districts, that is, the grouping of two or more counties, neither or none of which has a voting population equal to the ratio for a senator or a representative, and giving to the district so formed more than one senator or representative.

The court will take notice of a census or other enumeration made under the authority of the State, or of the United States; also of the location, boundaries, and juxtaposition of the several counties of the State. *State* v. *Cunningham, supra.*

By the act of 1895 the counties of Randolph, Delaware and Madison are grouped into one district, which is given two senators. By the enumeration of 1889, under which the apportionment of 1895 was made, there were in the county of Randolph 7,250 male inhabitants over the age of twenty-one years; in Delaware, 7,138; and in Madison, 8,010. The ratio, or average number of such voting inhabitants in the State, entitled to be represented by one senator in the gen-

eral assembly, was 11,020. None of the counties in this double district, therefore, had a voting population equal to the ratio for a senator; and yet each of them is allowed to vote for two senators.

It was said in *Parker* v. *State, ex rel., supra,* in speaking of Clark county, and also of Brown county, in relation to the apportionment of 1891, each of those counties having a voting population less than the ratio for a senator: "When a county of that size has been asisgned to a senatorial district, and given a voice in the election of one senator, it ceases, in our opinion, to be a factor in any legitimate scheme of apportionment for senatorial purposes."

That, in the act of 1895, the scheme of apportionment by which this double representation was secured, differs from the scheme or plan adopted in the act of 1891, can make no difference. The end attained is the same, whether it be done by a double district or by two single districts. In either scheme a county having less than the ratio entitling it to be represented by one senator is nevertheless given a voice in the election of two senators.

Indeed, the scheme adopted in the act of 1891 is the less objectionable. In that apportionment, the counties of Clark, Scott and Jennings, none of them having a population equal to the ratio, were joined in one district and given a senator. So the counties of Clark and Jefferson, neither with a population equal to the ratio, were formed into another district and given a senator. If the four counties were put into one district and given two senators, as they might have been, according to the scheme adopted in the act of 1895, the result could have been no more unjust than it was, the four counties controlling the election of two senators by either plan.

But in truth, the plan adopted in the act of 1891 is

the more nearly equitable; for the reason that, by making two single districts, instead of one double district, it might be possible for each district to elect a senator of its choice, notwithstanding the vote of the common county thrown in to control each district; whereas if the four counties were thrown together the combination would be sure to carry both senators.

The plan of the act of 1891, condemned as it was, and rightly so, by this court, in *Parker* v. *State, supra,* was yet nearer to the constitutional standard, local county representation, than is the double district systen of the act of 1895. So odious, indeed, has this double district system been regarded that in the constitutions of many of the States it has been specifically forbidden, and the single district system alone authorized, even so far as to require that a county entitled to more than one member should be divided into as many districts as there are members.

The observations made in regard to the double senatorial district of Randolph, Delaware and Madison, apply also to the district made up of the counties of Clinton, Boone and Montgomery; and likewise to that composed of the counties of Miami, Wabash and Huntington. None of those counties had a voting population equal to the number fixed for one senator; and yet each is given a voice in the election of two senators.

What is said of the double senatorial districts is likewise true of the double representative districts. The ratio for the election of a member of the house of representatives, according to the enumeration of 1889, was 5,510. The county of Perry had 4,152; Crawford, 3,076; and Orange, 3,454. None of these counties, therefore, had a voting population equal to the ratio for one representative; yet, by throwing the three into one district, each county was given a voice in the elec-

tion of two representatives. The same may be said of the double representative district of Brown, Johnson and Morgan; and that of Monroe, Lawrence and Martin.

It may be replied, that by thus throwing counties into a double district, equality of proportionate representation is more nearly secured, and the fractions of population over and above even ratios are reduced in number and amount. If this argument were good, it should be pushed further. The greater the number of counties grouped into one district, the fewer will be the fractions of excess in population, and the more exact will be the proportionate representation of the people in the general assembly. If the number of counties in a senatorial district, and likewise in a representative district, were increased to ninety-two, being the whole number in the State, the perfection of equal proportionate representation would be attained.

But if the senators and representatives were thus elected by the people at-large, and on one ticket for the whole State, there would, as we have already seen, be a total loss of local representation, the most precious right of free government. The counties would be obliterated. Yet, as we have also seen, the constitution provides for county representation, quite the same as for proportionate representation. The words used in section 5, of Article 4, as already quoted, are: "The number of senators and representatives shall * * * be fixed by law, and apportioned among the several counties, according to the number of male inhabitants above twenty-one years of age in each." Local representation was deemed by the framers of the constitution to be as necessary as proportionate representation; so the members of the general assembly were not only to be apportioned "according to the number" of inhabitants, but were to be appor-

tioned "among the several counties," and according to the number of inhabitants "in each."

The rule, as stated by Pinney, J., in *State* v. *Cunningham, supra,* citing Sedgw. Stat. and Const. Law, 200, and Endlich Interp. Stat., section 23, is, "that effect is to be given to every clause or word of a statute, and no word is to be treated as meaningless if a construction can be legitimately found which will preserve it and make it effectual; and this rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication." Citing also Cooley Const. Lim. 72, and numerous other authorities.

In the section quoted from our constitution, not only are "the several counties" named as entitled to representation, but particular attention is drawn to the representation of the inhabitants "in each" of the counties. And in section 6, of Article 4, it is further provided that "no county, for senatorial apportionment, shall ever be divided." Regard for the integrity of the county, as a governmental subdivision of the State, is thus made an essential feature in every valid plan of apportionment.

The people of a county have common interests and objects peculiar to themselves, and intimate public relations with each other. Hence, when the constitution was formed, it was deemed of vital importance that the integrity of counties in the formation of legislative districts should be thus carefully guarded; "to the end, that each county having sufficient population should have its own representatives in the legislature, chosen by its own electors and them only, and owing

no divided, perhaps conflicting, allegiance to any other constituency." True, because of the sparse population in certain parts of the State, it was, and is, necessary in some cases to include more than a single county in one district. This, however, is but a partial, though necessary, exception to the rule that each county is entitled to its own separate representative. See Chief Justice Lyon, in *State* v. *Cunningham, supra.*

Each county, and each district consisting of two or more counties, and being the least number having a population equal to the numerical unit for representation in the general assembly, is entitled absolutely to one member in Legislature. See also *Parker* v. *State, ex rel., supra.*

It is therefore apparent that in all the double districts formed by the act of 1895, although any one of the three counties so joined did not have a voting population equal to the ratio for a member in the general assembly; yet, that any two of such counties, being adjacent and having together such sufficient population, were quite as much entitled to their senator or representative as any single county with such population would be. The constitution protected them with such population from being overwhelmed by the unfriendly population of another county.

It may be urged that cases might arise when double districts would be necessary, in order to secure approximate equality in proportionate representation. It is certain, however, as we are satisfied, that other methods less obnoxious to the requirements of the constitution can be resorted to in such extreme and exceptional cases, should they arise.

In case of counties having a less voting population than the ratio of representation, and also in case of fractions of population left after giving to a county the representation to which it is itself entitled, great

discretion must, of course, be left to the legislature in grouping such counties for representation. But in no case can a county having less than the ratio be so grouped with other counties as to have a voice in the election of more than one member of the general assembly, wherever it is possible to avoid it. And in disposing of such counties with population less than the ratio, and also in disposing of the fractions of excess of population over the ratio or ratios in other counties, as said by Chief Justice Morse, in *Board, etc.,* v. *Blacker, supra,* "There can be no legislative discretion, under the constitution, to give a county of less population than another a greater representation." As in the apportionment for members of Congress, when the several counties have been given the representation to which they are severally entitled by reason of their full ratios, then the largest excess over such ratios should receive first consideration. These are salutary rules, to be applied in every case where it is practically possible to do so.

But, it may be said, when the legislature, in the exercise of its best judgment and discretion, has formed the several counties into single senatorial and representative districts, there may still remain large excesses of population over the ratios unrepresented. To this it may be answered as said in *Parker* v. *State, ex rel., supra,* "When it is found that exact equality cannot be attained, where the integrity of the county is preserved, approximation becomes a rule as binding upon the general assembly as any other rule fixed by the constitution. * * * The constitution requires that the State shall be apportioned every six years according to the male inhabitants over the age of twenty-one years in each county. It contemplates the formation of districts, each embracing, as nearly as possible, an equal

number of electors of the State. But the rule requir-
ing an approximation to equality forbids the forma-
tion of districts containing large fractions unrepre-
sented, when it is possible to avoid it, while other
districts are largely over-represented."

This rule of approximation, thus prominently set
out in *Parker* v. *State, ex rel., supra,* as it is also re-
peated and insisted upon in this case, must, of course,
be understood as entering into every rule laid down
in relation to apportionment. As said by Webster,
when the exact requirement of the constitution can
not be observed, then the obligation of observing such
requirement as nearly as possible becomes itself of
binding force under the constitution.

It is further urged against the apportionment law
of 1895, that it violates sections 2, 3 and 7, of Article 4
of the constitution, by placing in districts having
"hold-over" senators certain counties which, under a
former apportionment, voted four years previously for
senators, and should vote at the next election for suc-
cessors to such senators; but which under this appor-
tionment could not vote until two years later for sen-
ators, thus depriving the electors of such transferred
counties from voting for senators oftener than once in
six years, whereas they are entitled, under the consti-
tution, to vote for senators every four years.

There can be little doubt that the transfer of coun-
ties from districts which would have elected senators
at the next election thereafter to districts which
would not elect until two years thereafter, might be-
come a source of great abuse of legislative discretion;
and if it appeared that such abuse of discretion were
gross or wanton, or indulged in merely to disfranchise
voters of certain counties, allowing them to vote for
senators but once in six years, while voters in other
counties were permitted to vote for senators once in

two years, the apportionment thus made might be declared invalid.

While it cannot be said, as an abstract proposition, that such transfer of counties into "hold-over" senatorial districts, is in itself unconstitutional; because, if it were so held it might be quite difficult, or even impossible, with a due observance of other provisions of the constitution, ever to rearrange the senatorial districts in any six-year period; yet, on the assumption that such an outrageous act of injustice had been attempted and carried out in an apportionment, merely to give to the people of one set of counties an undue advantage over the people of other counties, we could find no words too strong to express our condemnation of such abuse of legislative discretion, and for this reason alone would not hesitate to declare such a law invalid. But having found it necessary to pronounce the act before us unconstitutional for reasons that admit of no uncertainty or doubt, we deem it unnecessary to further consider the abuse here suggested.

Some other unfair features of the act of 1895 are quite noticeable. For example, the county of Marshall, with a voting population of 6,150, or 640 over the ratio, is given but one representative; while the counties of Noble, Gibson, Daviess and Hamilton, each with a population less than that of Marshall, is yet given, not only one representative, but also a voice in the election of another; thus violating the principle that a county of less population than another should not be given a greater representation. It need hardly be added that such favoritism and injustice should be avoided wherever possible.

In the case of Daviess county, the additional representative was secured at the sacrifice of at least two other elements of a fair apportionment. The small excess in that county, 331, is used merely to make con-

tiguous, and so control the vote of Knox and Dubois counties. Yet Dubois alone had nearly enough population to be entitled to a representative; and with the excess in Knox had more than enough to give the two counties such representative. The placing of Daviess with those two counties, being itself already assigned one representative, and throwing it between those counties in a forced union, so as to control the election of a second representative, has in it no element of justice or fairness, provided only such result could possibly be avoided. A like wrong is done in thrusting Gibson between Pike and Vanderburgh, which likewise could be justified only on the plea of absolute necessity.

Other instances may be found, not so objectionable, perhaps, but which would be absent from a perfectly fair apportionment. Thus it may be noted that the county of Tippecanoe had one full ratio, for which it was given a representative, with an excess of 4,340, for which it was given another representative; while the county of Tipton, with 4,386 voting inhabitants, was refused a separate representative.

The unconstitutionality of the apportionment act of 1895 being therefore evident from the provisions of the constitution, and from the principles established by the courts, and particularly by this court in the case of *Parker* v. *State, ex rel., supra,* it remains, in order to determine whether the appellant was entitled to the relief demanded by him, to inquire as to the constitutionality of the act of 1893.

The unconstitutionality of this act is readily apparent, both from what we have said as to the act of 1895, and also from the decision in the case of *Parker* v. *State, ex rel., supra.*

In the first place, there are two double representative districts. Neither Dubois, Martin, Orange nor

Lawrence county had a population equal to the ratio for a separate representative; yet each of them, by being joined in one district, was given a voice in the election of two representatives. By simply applying the principles and arguments urged by counsel for appellee against the double districts formed by the act of 1895, we could but make a like holding as to the unconstitutionality of this double representative district formed by the act of 1893. The district of Adams, Jay and Blackford is even more objectionable. Neither Adams nor Blackford was alone entitled to a representative, though both together would have been entitled to one, while Jay alone was entitled to a representative; yet all three were joined and given two representatives.

So, in the senatorial apportionment, the county of Clark, which did not have a voting population equal to the ratio for one senator, was yet joined in one district to Scott and Jennings, and in another to Jefferson, and thus given a voice in the selection of two senators.

This act also, as does the act of 1895, offends against the principle that a county of less population than another should not be given a greater representation, unless it should be absolutely necessary to do so. The county of Shelby, with a voting population of 6,545, being 1,035 over the ratio, and the county of Dearborn, with a voting population of 6,382, being 872 over the ratio, are each given one representative, and also a voice in the selection of another; while the counties of Randolph, Delaware, Boone, Wabash, Huntington and Grant, each with a greater voting population than either Shelby or Decatur, are given each one representative only.

A graver violation of this principle is found in the case of the counties of Harrison, Ripley, Franklin,

Sullivan, Putnam and Tipton, each having a voting population less than the ratio, but each of which is given a representative, being all that they could be entitled to; yet each of these counties is also given a voice in the election of an additional representative. The district consisting of Ripley, Franklin and Union is the most objectionable of this class, for the reason that Union, the only county of the district not already fully represented, had only 1,976 voters, and could not therefore by its own slight population uphold the representative. The offense of the legislature of 1893, as also of the legislature of 1895, against the commands of the constitution, is the more reprehensible from the fact that the decision of this court, in *Parker* v. *State, supra,* had then been made, and many of the violations of the constitution made in both those acts are shown to be such in that decision. Much, therefore, of what we have said as to the assumption of unlawful power by the legislature of 1895 is equally applicable to the action of the legislature of 1893.

To all the objections thus made to the constitutionality of the apportionment act of 1893 counsel for appellee make but one reply. They gravely contend that the constitutionality of the act of 1893 has been adjudicated and the act declared constitutional.

This contention is based on the judgment of the Marion Circuit Court, in the case of *Wishard* v. *Lenhart, supra,* to which we have heretofore referred, and the appeal from which judgment, No. 17,385, was dismissed in this court, on motion of the appellant, November 27, 1894. The purpose of that action was to test the constitutionality of the apportionment act of 1893; and, by the judgment of said circuit court, rendered upon demurrer to the complaint, the act was, in effect, held to be a valid law.

At furthest, and we should hesitate to give it that

force without special plea, that decision could be controlling only within the jurisdiction of the court making it and between the parties to that suit.  The binding force of such a decision, as said in 5 Chicago Law Jour. 863, quoting from Judge Cooley, goes only to this extent, namely:  "A decision once made in a particular controversy, by the highest court empowered to pass upon it, is conclusive upon the parties to the litigation and their privies;" and again, "The doctrine of *stare decisis*, however, is only applicable in its full force within the territorial jurisdiction of the court making the decision."

Indeed, it is by no means clear how it was intended by counsel that the judgment here referred to should be treated as a former adjudication of the questions at issue in the case at bar.  In the first place, the judgment has not been set out in the complaint, nor has it been in any way specially pleaded.  Neither has it been pleaded on appeal, even if such plea could be made on appeal.  *Eckert* v. *Binkley*, 134 Ind. 614.  But even if such judgment were pleaded, it would seem that there could be no question of former adjudication entertained as counsel urge.  "Before the rule of former adjudication can be invoked, it must appear that the thing demanded was founded upon the same cause of action; that it was between the same parties and found for one of them against the other in the same quality.  The parties must not only be the same, but must also be suing in the same right."  *Kitts* v. *Willson*, 140 Ind. 604.  See further the learned work of Judge Van Fleet on Former Adjudication, Chap. 11, and generally.

It is enough to say on this feature of the question, that in the case in the circuit court, Albert W. Wishard was the party plaintiff; while in the case at bar

the plaintiff was "The State of Indiana on the relation of Ferd E. Basler." The parties plaintiff were not the same, and for this reason alone the rule of former adjudication cannot apply. See *Glenn* v. *State, ex rel.*, 46 Ind. 368; *Maple* v. *Beach*, 43 Ind. 51.

In the former of these cases it was held that a judgment in an action brought by Margaret Clore against William Glenn, could not be considered as a former adjudication of the issue in an action brought in the name of The State of Indiana on the relation of Margaret Clore against William Glenn, although the facts were precisely the same in both cases. In the two cases now under consideration, it will be remembered that Albert W. Wishard, the plaintiff in the former action, is not a party, nor even a relator, in the case at bar.

Neither do we think there is any estoppel here, as in the case of *Vickery* v. *Board, etc.*, 134 Ind. 554, to which we are referred. There the party bringing suit to enjoin a levy of taxes to pay for bonds issued on purchase of a toll road, had waited until he received the benefit of the bonds before asking the court to declare unconstitutional the law under which they were issued. Here, while there may be some question of private or personal benefit, yet the issue before the court is much broader. The action concerns all the people of the State, in their most enlarged and sacred relations of citizenship and government; and the case cannot be tied up with the purely private rights of any one. It is true that an action to test the constitutionality of the law, if brought at all, should have been pressed to a final determination in the first place, and before the election of the present legislature, which is but a *de facto* body, in case the law of 1893, under

which it was chosen, is invalid.  Yet the people of the State, in their sovereign capacity, cannot for such reasons be estopped from asking for a determination of the validity of a law under which it is now proposed that they shall elect their next legislature.  When the people of the State appear at this bar with such an issue, there can be no question of estoppel.  The inquiry is one reaching to the foundations of the government.

While, then, all respect will be given to the judgment of the circuit court, in this, as in every other case, yet we cannot seriously entertain the contention that such adjudication of a constitutional question is of binding force in this court.  More than this, no property right or contract between the parties being involved, it will not be considered that the rule of *stare decisis* requires that, in deciding so grave a matter as that of the constitutionality of an act of the legislature, we should be bound by even our own former decisions.

In such a case, as forcibly said by Chief Justice Bleckley, in *Ellison* v. *Georgia, etc., R. R. Co.*, 87 Ga. 691, the maxim for a supreme court, "supreme in the majesty of duty as well as in the majesty of power," is not "*stare decisis*," but "*fiat justitia.*" Let this decision be right, whether other decisions were right or not.

In *Walsh, Treas.*, v. *State, ex rel.*, 142 Ind. 357, involving the constitutionality of the fee and salary act of 1891, this court did not hesitate to overrule its own decision as to the validity of the same law, in *State, ex rel.*, v. *Boice*, 140 Ind. 506, when satisfied that the decision first rendered was erroneous.  See further, *Robinson* v. *Schenck*, 102 Ind. 307; and also the exhaustive discussion of this subject in *State* v. *Aiken* (S. C.) 26 L. R. A. 345, and authorities there cited.

We are, therefore, of opinion that both the apportionment act of 1895, and also that of 1893, are unconstitutional and void; and, consequently that the appellee was not entitled to the relief demanded by him in his complaint, and which was awarded him by the decision of the trial court.

This court, in the case of *Parker* v. *State, ex rel, supra,* while deciding that the apportionment acts of 1891 and 1879 were both invalid, yet expressly held that the constitutionality of the intermediate act of 1885 was not before the court for adjudication, and accordingly refrained from making any decision in regard to it. Neither has the constitutionality of the apportionment act of 1885 been questioned in the case at bar. Consequently, that act is the last, and perhaps the only, expression of the legislative will left upon the subject of apportionment and under which senators and representatives may be chosen at the general election of 1896, unless the governor should see fit to call a special session of the legislature to pass a new apportionment law.

The judgment is reversed, with instructions to the circuit court to sustain the demurrer to the complaint, and for further proceedings not inconsistent with this opinion.

McCabe, J., concurs.

Monks, J., concurs in result.

Filed Jan. 30, 1896; petition for rehearing overruled April 15, 1896

### CONCURRING OPINION.

HACKNEY, C. J.—While giving my full concurrence to the conclusions of the principal opinion it is my purpose to add one or two thoughts to what my associate has well said.

This suit, in form and effect, disaffirmed the consti-

tutionality of the apportionment act of 1895 and affirmed the constitutionality of that of 1893. The decree of the lower court, by forbidding steps under the act of 1895 and commanding that such steps, towards the biennial election of this year, be taken under the act of 1893, held the law of 1895 to be void and that of 1893 to be valid. The question of the correctness of this holding of the trial court, thus involving both of said laws, is before this court.

The act of March 5, 1895, repealing that of 1893, and the other act of that date reapportioning the State, have been considered in the principal opinion, and properly, in my judgment, as one act, since, by the constitution it was not contemplated that the general assembly could, by repealing an apportionment act, deprive the people of the right to choose their representatives and could not supplant an apportionment act, properly enacted, excepting at the sexennial periods. The two acts mentioned were passed concurrently, and could have been separated only in the hope that if the second should not stand the first should have the effect to repeal the law of 1893 and require the next general assembly to be chosen under some prior law, or under some law which might be enacted by a special session made necessary by the absence of any apportionment law. The only remaining alternative would be that the people should be without a law under which to choose the next general assembly, an alternative probably not contemplated when these acts were passed, and one which the framers of the constitution certainly never intended should arise. That it was intended to carry down the act of 1893 at all hazards is manifest, not only from the express repeal of that act, but also from the language of the preamble to the repealing act. It is declared therein that the act of 1893 is unconstitutional and

was intended by the general assembly which passed it to be unfair, unequal, in violation of the constitution and in disregard of a decision of this court. While thus assuming the judicial function of declaring an act of the general assembly unconstitutional, and while assuming the effect of that declaration to carry down the law of 1893, it is, by the last paragraph of the preamble, expressly conceded and declared to be the province of the courts to pass upon the constitutionality of laws. The effect of this preamble is a question in this case. It voices the conclusion of its authors that the power to enact an apportionment law, out of the sexennial period, depends upon the non-existence of a constitutional law apportioning the State; hence, the express declaration that the law of 1893 was unconstitutional. There is but one other possible construction of the preamble, and that is that its authors desired simply to challenge the integrity of those who had preceded them in the high office of legislators, and who had taken an oath to support that constitution which is said, by this preamble, to have been wilfully violated. This latter construction is not essential to the principal object: the passage of a new apportionment act. The former construction was regarded as essential to that end, and stands in this case as the justification for reapportioning the State before the period contemplated by the constitution. As said in the principal opinion, and as practically conceded by the closing paragraph of the preamble, the declaration that the law of 1893 was void was beyond the authority of the general assembly, was the exercise of judicial power and is now without force. It is even more than this, it is a declaration that those who made it held their places as members of the general assembly alone by virtue of the very law declared by them to have been void and of no effect.

Denney, Clerk, *et al. v.* The State, *ex rel.* Basler.

These considerations are pertinent, not only to a decision of the question of the power of the general assembly to exercise judicial functions, but they are of moment in looking to the consequences which may follow such exercise of power and the possible consequences of this proceeding. All tribunals of organized society accord to precedent respectful observance, and generally obedience, unless such precedent is palpably at variance with justice, morals or the fundamental law. Especially do the members of society owe this observance and obedience to the written laws. None rest under this obligation more fully than those who make and those who execute the laws. It is the precedent established by this court in the Parker case (133 Ind. 178), which is urged by the appellants, to overthrow the law of 1893, and by which, in a great measure, we are controlled in passing upon that and the act of 1895. No tribunal can maintain long the respect of society if it may wantonly, or even with indifference, reverse today its action of yesterday. This is true whether that tribunal is judicial or legislative. The same rule, which is certainly our guide, should be the guide of other co-ordinate departments of the government.

Finding the act of 1893 upon the statute books and bearing in mind that no valid act could be passed at that period in the absence of the conclusion that the act of 1893 was void, the Legislature assumed and declared that such act was void. If this may be done in any case it may be done in every case, and the legislature may be found repealing its enactments at each succeeding session. The spirit of the constitution forbids this with reference to apportionments, and tolerates it only in the event that such conclusion is unmistakably correct.

One of the consequences of the law of 1895 was to

require judicial investigation and decision as to which of two laws should be observed by the people; both could not stand; the first being valid there could be no authority for the second. Another consequence was that it supplanted a law no more objectionable, under the constitution, than itself. Looking beyond the mere partisan advantage to be gained by the enactment of either law, what shall become of the principle of local self-government and the prerogative of proportionate representation? It is a more than important question; it is, in view of the present situation, startling. There is, by the invalidity of the acts of 1893 and 1895, no apportionment law since that of 1885, which has not been found, upon judicial investigation, to have violated the constitution. The law of 1879, the last before the act of 1885, was held, in the Parker case, to be unconstitutional. When the acts of 1893 and 1895 fail, where shall the people look for the apportionment, a necessary prerequisite, upon which to elect the next general assembly? It may be said that the governor will convene the last chosen general assembly in special session for that purpose. While the enactments of merely *de facto* legislators are generally upheld for the peace and good order of society, it may be seriously questioned whether one chosen under a void law is a *de facto* officer continuously for the mere purpose of keeping the office filled. A merely *de facto* officer is not, usually, entitled to hold for a full term, in an office whose functions are in continuous operation, when a *de jure* officer is chosen during such term.

*De facto* officers get no power or authority from the acts they perform, but the principle which supports the acts of such officer is that the public, finding him in actual possession of the office and dealing with him, under circumstances of reputation and color which

Denney, Clerk, *et al. v.* The State, *ex rel.* Basler.

would lead men to suppose him a legal officer, such dealings are validated on the ground of public policy. But there are authorities, though we have no occasion to apply them in this illustration, to the effect that when the want of authority in such officer to perform the acts in question becomes notorious the reason for the *de facto* doctrine ceases. An essential feature of the doctrine would seem to be that it is considered only with reference to past acts and not as justifying further acts and the continued right to occupy the office where the duties of the office are not in continuous exercise, but at the close of a session cease forever, unless specially called into action before new officers convene in regular session again.

This would not only suggest the doubts arising to influence the governor in calling or declining to call together persons who had occupied, *de facto,* an office not in continuous operation, and one which, it has become notorious, they held without the sanction of law, but as suggesting also the possible right of the people to elect, at the next election, *de jure* senators to represent them instead of those chosen under a void law.

Another fact which might be influential upon the mind of the executive, as to his duty to call a special session of the general assembly, is the fact that at the regular session, while condemning the act of 1893 for its violation of the constitution, another law was enacted as grossly violating the same principles of that sacred instrument. If the special session should repeat the disregard of existing enactments and the decisions of the courts, no relief would come, and it would be no less anarchistic to deprive the people of a constitutional choice by affirmative legislation than by no legislation. But, I apprehend, the governor would be slow to call a special session when the act of

1885 stands upon the statute books unchallenged, and when this court, in the Parker case, where the question was made, expressly declined to declare it unconstitutional, though the acts of 1879 and that of 1891 were both held void. I should probably say, however, that the governor, in discharging his duty, has the same power, subject to the same limitations, to regard existing apportionment laws as constitutional or unconstitutional that the general assembly had.

It is insisted, however, that by the constitution an apportionment law becomes, by the lapse of time, inoperative after six years, and that, therefore, all acts prior to 1891 have expired. There can be but little doubt that the command of the constitution is mandatory and exclusive in that it requires an apportionment at each six-year's period, and forbids it at other times. It is no less clear, in my judgment, that, as maintained in the principal opinion, the duty enjoined is continuing and may be discharged subsequently, if not discharged as commanded. This conclusion renders another conclusion inevitable, and that is that the choice of the people is a right to be exercised upon the rule of apportionment existing at the time the neglected duty should have been performed. If this were not so there would never be a legislature following that which had neglected its duty to supply the basis for choosing the next. I cannot believe that the framers of the constitution contemplated the surrender by the people of the power to elect representatives to the general assembly, at the expiration of a sexennial period, in the event of a failure to enact a law or the enactment of an invalid law. If it had been intended to make the continuance of this power dependent upon legislative action, there was no reason for the mandatory provision of the constitution as to apportionment; the whole subject would have been

left with the legislative department of the government. Nor can I believe it intended that, in the absence of renewed legislative apportionment, the reserved right to elect an assembly was to be exercised upon some basis to be determined by the masses.

Such a rule would be simply a substitute for a constitutional provision, and its enforcement, where party spirit becomes so intense as it does with us, would be fraught with difficulties certainly never intended to be left unguarded by constitutional restrictions.

The assembly of 1855 found no enumeration upon which to make an apportionment as then required, and, in the election of 1856 the assembly was chosen upon the prior apportionment. The assembly so chosen, at its session in 1857, without enumeration, apportioned the State, and without question and without further apportionment the assemblies following that session were elected, under that apportionment, until Governor Morton, in January, 1865, called the attention of the session, then sitting, to this long continued failure of duty. At no time in the history of the State has an assembly been chosen upon a ratio adopted by common consent further than where the Legislature has failed to adopt an apportionment, elections have been held under the last preceding apportionment without objection, thereby giving construction to the constitution in accordance with the view now suggested, namely, that the act of 1885 is the last apportionment which stands unquestioned, and is that upon which the next election must be held if that law remains unquestioned.

That an apportionment does not lapse by the expiration of the six-year's period, in the absence of renewed valid apportionment, was, in effect, held in the Parker case, where, as I have said, this court declared the act

of 1891 unconstitutional and passed back of the law of 1885, notwithstanding the rule that courts never pass upon constitutional questions when a case may be decided without doing so, and held unconstitutional the act of 1879, then standing through more than two periods of six years.

Whether that act shall continue unquestioned; whether the people will follow the custom in such cases and make their election under that law, or whether that custom will be abandoned and public officers will refuse to follow it and thereby defeat the constitutional object to convene an assembly in 1897 depends upon the wisdom and patriotism of the people. I cannot believe that the governor would assume to declare the act of 1885 unconstitutional, to abandon the custom of the people construing the constitution in like cases, and then having done so, recall the last chosen assembly, with doubts as to its further authority, for the enactment of a new law. If the act of 1885 should, in proper proceedings, be declared invalid, and no preceding valid act of apportionment should be found, the maintenance of the legislative branch of the State government would hang upon the doubtful proposition that the governor could convene in special session, from the members last chosen, a *de facto* general assembly.

That such frightful consequences are possible from the character of the legislation now under consideration would seem to demand serious reflection, and such patriotic submission to the welfare of the government as would subordinate mere partisan advantage.

Filed January 30, 1896.

### CONCURRING OPINION.

JORDAN, J.—I concur in much of the reasoning of the principal opinion of the court, and in the conclu-

sion reached that the judgment below must be reversed. I also concur in the holding that the act of 1893, under the decision of this court in *Parker* v. *State, ex rel.*, 133 Ind. 178, is unconstitutional and therefore void. I am of the opinion that the formation of double districts should be condemned, and ought never to be resorted to by the legislature in the enactment of an apportionment statute, unless, in the sound discretion of that body, in some particular instance, on account of the situation of some counties, and their voting population, it may become absolutely necessary to do so, in order to attain that equality of representation required by the organic law of the State. Or, in other words, I am not prepared to declare a "hard and fast rule" upon this question from which the legislature can in no event depart.

Filed January 30, 1896.