# JUNE TERM, 1892.*

Theron F. Giddings v. Robert R. Blacker, Secretary of State.

*State Legislature—Constitutional law—Rearrangement of Senate districts—Mandamus—Jurisdiction—Private citizen as relator.*

1. The Supreme Court has jurisdiction, in a case properly before it, to determine the constitutionality of an act of the Legislature rearranging the Senate districts of the State.

2. The question of the validity of an act of the Legislature rearranging the Senate districts of the State can be raised by *mandamus* proceedings instituted by a private citizen and elector without a prior application to the Attorney General, where that officer has, in the performance of his official functions as adviser of the State officers, placed himself in an adverse position, which fact is sufficiently evidenced by his appearing for the officer named as respondent in such proceedings; citing *People v. State Auditors*, 42 Mich. 422.

3. Act No. 183, Laws of 1885, and Act No. 175, Laws of 1891, which attempt to rearrange the Senate districts of this State, are unconstitutional, because of the. failure of the Legislature to exercise an honest and fair discretion in apportioning the districts, so as to preserve, as nearly as may be, the equality of representation as required by the Constitution.

4. While the Constitution requires the Legislature to rearrange the Senate districts at the first session after each enumeration of the inhabitants of the State made by its authority or by the authority of the United States, each apportionment act remains in force until it is supplanted by a subsequent valid act.

*Mandamus.* Argued June 28, 1892. Granted in part July 28, 1892.

* Continued from Vol. 92.

Relator applied for *mandamus* to restrain the respondent from giving notice of the election of Senators under the apportionment act of 1891, and to compel him to give such notice under the act of 1885. The facts are stated in the opinions.

*Moses Taggart* and *F. A. Baker*, for relator.

*A. A. Ellis*, Attorney General, for respondent.

GRANT, J. The Constitution of Michigan contains the following provisions, found in article 4:

"SECTION 1. The legislative power is vested in a Senate and House of Representatives.

"SEC. 2. The Senate shall consist of thirty-two members. Senators shall be elected for two years, and by single districts. Such districts shall be numbered from one to thirty-two, inclusive, each of which shall choose one Senator. No county shall be divided in the formation of Senate districts, except such county shall be equitably entitled to two or more Senators.

"SEC. 4. The Legislature shall provide by law for an enumeration of the inhabitants in the year 1854, and every ten years thereafter, and, at the first session after each enumeration so made, and also at the first session after each enumeration by the authority of the United States, the Legislature shall rearrange the Senate districts  *    *    * according to the number of white inhabitants, and civilized persons of Indian descent not members of any tribe."

Acting under these constitutional provisions, the Legislature passed the senatorial apportionment act, No. 175, Laws of 1891. By the census of 1890 the population was 2,093,889. The ratio of each district would therefore be 65,434. Eight of the districts under this act contain populations as follows: Seventh, 91,420; tenth, 82,697; fourteenth, 88,678; eighteenth, 86,129; twentieth, 84,694; twenty-fifth, 82,556; twenty-seventh, 97,330; thirty-first, 82,213. These are the eight largest districts. Eight other districts contain populations as follows: Twelfth, 41,245;

eleventh, 42,210; sixteenth, 46,626; twenty-second, 42,546; twenty-third, 39,727; twenty-eighth, 43,701; twenty-ninth, 40,033; thirtieth, 53,068. Under this apportionment eight Senators would represent constituencies numbering in all 695,717, while eight other Senators would represent constituencies numbering in all only 349,156. The county of Saginaw is given two Senators, although it contains a population of only 82,273. The twenty-seventh district is composed of nine counties, with a population of 97,330, while the twenty-ninth, with eight counties, five of which adjoin a like number of counties of the twenty-seventh, contains a population of only 40,033.

The relator is a citizen and an elector in the seventh district, composed of the counties of Kalamazoo, St. Joseph, and Branch, with a population of 91,420, and prays for the writ of *mandamus* to restrain the respondent, the Secretary of State, from giving notice of the election of Senators under the act of 1891, and to compel him to give notice under the apportionment act of 1885. The petition also contains a prayer for general relief. The basis upon which relief is sought is that the power delegated by the above provisions of the Constitution to rearrange the senatorial districts is limited; that this limitation was wholly disregarded by the act in question, and the act is therefore unconstitutional and void.

It appears conceded by the learned Attorney General that the Legislature is not in the exercise of a political and discretionary power when acting under these constitutional provisions, for which it is only amenable to the people, and that this Court has jurisdiction, in a case properly before it, to determine the constitutionality of the act in question. The Constitution of this State provides:

"The Supreme Court shall have a general superintending control over all inferior courts, and shall have power to issue writs of error, *habeas corpus, mandamus, quo war-*

*ranto, procedendo,* and other original and remedial writs, and to hear and determine the same. In all other cases it shall have appellate jurisdiction only."

The general jurisdiction of this Court to determine the constitutionality of legislative enactments is not limited so as to exclude laws involving political rights. The constitution of Wisconsin, in conferring jurisdiction upon its supreme court, is nearly identical in language with the Constitution of this State. The supreme court of Wisconsin has recently most ably and thoroughly discussed and determined the jurisdiction of the court in a case similar in principle and its facts to the present one. *State v. Cunningham,* 81 Wis. 440 (51 N. W. Rep. 724). The authorities in support of the jurisdiction are there collated, and citations made from them. Were the power conferred upon the Legislature one of absolute discretion, then the express mandate, "shall rearrange according to the number of inhabitants," would be void of any force or meaning, except that it might be regarded as expressive of the opinion of the framers of the Constitution that such method would be equitable and fair. We have no doubt of the jurisdiction of the Court.

But it is insisted by the Attorney General that, inasmuch as the relator is a private citizen, having no interest in the matter above every other citizen, he has no standing in court, because, prior to filing his petition, he made no application to the prosecuting attorney of his county, the Attorney General, or other public officer, to apply to this Court for a *mandamus* touching the matter here at issue. In support of this claim he cites *People v. Regents,* 4 Mich. 98 ; *People v. Inspectors of State Prison,* Id. 187; *People v. Green,* 29 Id. 121; *People v. Supervisors,* 38 Id. 423.

In *People v. Regents* the application was to compel the regents to appoint a professor of homœpathy in the medical department of the University. The Court expressed its

conviction that that was a case in which the action of the Attorney General would have been proper and necessary, at the same time saying:

" We do not intend to say that a case may not arise in which this Court would allow an individual to file such a complaint, particularly if the Attorney General were absent, or refused to act without good cause."

In *People v. Inspectors of State Prison* a private citizen applied for the writ of *mandamus* to restrain the respondents from teaching to convicts in the State prison the mechanical trade of wagon-making. The main question was disposed of upon its merits, the Court expressing some doubt whether the relator had such clear legal right and special interest as to entitle him to make the application.

In *People v. Green* the application was to compel the county clerk and register of deeds to keep his offices at a certain place, he claiming that the county-seat had been lawfully removed. Relator's convenience in having access to the offices was the ground of his petition. It was held that he had shown no such special interest as to authorize him to proceed without application to the proper public officer.

In *People v. Supervisors* the application was to compel the allowance of claims alleged to be owing from the county to the city. The city authorities were, of course, the proper parties to institute the proceedings.

In *People v. State Auditors*, 42 Mich. 422, this precise objection was made, and the Court said:

" In the present case the officer whose duty it usually is to enforce the rights of the State in this Court has, in the performance of his official functions as adviser of the State officers, placed himself in an adverse position, and appears for the respondents on this application."

The present case comes directly within that decision. The law does not require unnecessary things to be done.

When the Attorney General appears for a respondent, it certainly follows that he is adverse to the position of the relator, and that an application on the part of the relator to him to commence the proceedings would be met with a non-compliance. This Court, as appears from the authorities above cited, has taken care to prevent officious intermeddling by the use of this discretionary writ, and at the same time has swept away technicalities where public interests are involved and prompt action is necessary. We have quite uniformly overruled this objection in cases of the latter class.

The unconstitutionality of the act is clear. The county of Saginaw, with only 16,839 inhabitants in excess of the ratio, is divided into two senatorial districts, one having 25,707 less than the ratio, and the other having 22,888 less than the ratio. There is no basis, constitutional or otherwise, for such an apportionment. It is contemplated by the Constitution that the ratio shall govern so far as is practical. This is apparent    from the provision that—

" Each county hereafter organized, with such territory as may be attached thereto, shall be entitled to a separate Representative when it has attained a population equal to a moiety of the ratio of representation."

The Constitution of the United States provides that—

" The number of Representatives shall not exceed one for every 30,000, but each state shall have at least one Representative."

Under the first census, which showed the total number of free persons, with three-fifths of the slaves, to be 3,606,-397, Congress fixed the number of Representatives at 120, being one for every 30,000. In the apportionment, Massachusetts was entitled to 15 Representatives, with an excess of 25,327, for which she was given an additional Representative. Other states with a similar large excess were treated likewise, while those states which had a small excess

received no additional representation therefor. President Washington, by the advice of Jefferson, Randolph, and Madison, vetoed the bill as unconstitutional, giving the following reasons:

"*First*. The Constitution has prescribed that Representatives shall be apportioned among the several states according to their respective numbers; and there is no one proportion or divisor which, applied to the respective numbers of the states, will yield the number and allotment of Representatives proposed by the bill.

"*Second*. The Constitution has also provided that the number of Representatives shall not exceed one for every 30,000, which restriction is by the context and by fair and obvious construction to be applied to the separate and respective numbers of the states, and the bill has allotted to eight of the states more than one for every 30,000."

A county having an excess of only about one-fourth of the ratio is not, in the language of the Constitution, " equitably entitled to two or more Senators," while one district composed of nine counties, and containing nearly two and a half times the population of each district into which the former county is divided, receives but one Senator. Equity has no definition applicable to such a case. It was never contemplated that one elector should possess two or three times more influence, in the person of a Representative or Senator, than another elector in another district. Each, in so far as it is practicable, is, under the Constitution, possessed of equal power and influence. Equality in such matters lies at the basis of our free government. It is guaranteed, not only by the Constitution, but by the ordinance of 1787, organizing the territory out of which the State of Michigan was carved. *State v. Cunningham,. supra.*

Aside from considerations of equity and justice, it is apparent that the framers of the Constitution understood that a county, to be entitled to two Senators, must have a

ratio and a moiety of a ratio of population. Constitutional
Debates of 1850, pp. 113, 119, 123, 361, 368, 374, 376.

The State cannot be divided into senatorial districts
with mathematical exactness, nor does the Constitution
require it.  It requires the exercise on the part of the Leg-
islature of an honest and fair discretion in apportioning the
districts so as to preserve, as nearly as may be, the equal-
ity of representation.  This constitutional discretion was
not exercised in the apportionment act of 1891.  The facts
themselves demonstrate this beyond any controversy, and no
language can make the demonstration plainer.  There is no
difficulty in making an apportionment which shall satisfy
the demand of the Constitution.

It is not the purpose or province of this Court to inquire
into the motives of the Legislature.  Courts will not discuss
the motives of legislative bodies except as they appear in
the public acts or journals of such bodies.  The validity
of an act does not depend upon the motive for its passage.
The duty of a court begins with the inquiry into the con-
stitutionality of the law, and ends with the determination
of that question.

The petition prays that the respondent be directed to
give notice of the election under the apportionment act of
1885.  The constitutionality of this act is therefore directly
involved in the controversy, unless it be held to be removed
from question by the fact that the people have acquiesced
in its validity by acting under it for three elections.  It
must be conceded that this act is affected with the same
constitutional infirmity as the act of 1891.  It is unneces-
sary to determine whether such infirmity exists to an equal
or a greater or less degree.  It is sufficient to say that it
is not in accord with the Constitution, and for the same
reasons which apply to the act of 1891.  It is therefore
insisted with great force by the Attorney General that no
election should be ordered under the former act, and he

also urges in consequence that no relief can be granted. It is also said by him that, so far as he has examined other apportionment acts, they are all subject to the same objection. Under this reasoning it would follow that, if the act of 1891 is held to be void, there is no remedy, except the Executive of the State decides to call a special session of the Legislature. In such case there would be no apportionment law under which the people might elect a Legislature. While the Constitution requires the Legislature to rearrange the districts at the next session after each enumeration, yet we are of the opinion that each apportionment act remains in force until it is supplanted by a subsequent valid act. It was my opinion that the respondent should be directed to give notice under the act of 1885, inasmuch as the people have acquiesced in its validity by so long acting under it. But I yield my opinion to that of my brethren, who are of the opinion that the notice should be given under the law of 1881, the validity of which is not here brought in controversy, unless the Executive shall call a special session of the Legislature.

Our conclusions therefore are:

1. The petition is properly brought into this Court by the relator.

2. The Court has jurisdiction in the matter.

3. The apportionment acts of 1891 and 1885 are unconstitutional and void.

4. The writ of *mandamus* must issue, restraining the respondent from issuing the notice of election under the act of 1891, and directing him to issue the notice under the apportionment act of 1881, unless the Executive of the State shall call a special session of the Legislature to make a new apportionment before the time expires for giving such notice. No costs will be allowed.

LONG and MONTGOMERY, JJ., concurred with GRANT, J.

MORSE, C. J. *(concurring)*. It is evidently contemplated
by the Constitution that the county shall be the essential
factor in the formation of senatorial districts. "No county
shall be divided in the formation of Senate districts,
except such county shall be equitably entitled to two or
more Senators," is the prevailing idea of the organic pro-
vision. It is further contemplated that such districts shall
be arranged according to the "number of white inhabitants,
and civilized persons of Indian descent not members of
any tribe." This equality of representation, however, is
secondary to and hampered by the fact that no county
can be divided, and a part of it attached to another county,
or the part of another county, in order to make the
districts equal, or nearly so, in population. This express
inhibition against the division of a county gives, necessarily,
great latitude to the legislative discretion, and the sena-
torial districts must of necessity not be as equally divided
as to population as might be done if county lines could be
disregarded. The Legislature undoubtedly could take a
partisan advantage by making choice of different counties,
and joining them together in one senatorial district, when
such counties are contiguous; so that one Legislature of one
political complexion might put, for instance, Macomb and
St. Clair in one district, while another of a different
political complexion might join Macomb with Lapeer, and
St. Clair with some other adjoining county, and not
violate any constitutional rights of the electors of such
districts. But, as shown by Mr. Justice GRANT, the
Legislature in the senatorial apportionment of 1891 went
far beyond any legitimate discretion, and violated the rules
of equity, when it was not necessary, or even proper, to do
so, because of the fact that a county could not be divided.
The twenty-seventh and twenty-ninth districts lie con-
tiguous to each other, so that there was no excuse for

putting 97,330 people in one and only 40,033 in the other.

The senatorial apportionments of 1891 and 1885, which are before us, so that we are compelled to examine them, were neither of them arranged in view of the Constitution or the rights of the electors of this State. While it is true that the motive of an act need not be inquired into to test its constitutionality, I believe that the time for plain speaking has arrived in relation to the outrageous practice of gerrymandering, which has become so common, and has so long been indulged in, without rebuke, that it threatens not only the peace of the people, but the permanency of our free institutions. The courts alone, in this respect, can save the rights of the people, and give to them a fair count and equality in representation. It has been demonstrated that the people themselves cannot right this wrong. They may change the political majority in the Legislature, as they have often done, but the new majority proceeds at once to make an apportionment in the interest of its party, as unequal and politically vicious as the one that it repeals. There is not an intelligent school boy but knows what is the motive of these legislative apportionments, and it is idle for the courts to excuse the action upon other grounds, or to keep silent as to the real reason, which is nothing more nor less than partisan advantage taken in defiance of the Constitution, and in utter disregard of the rights of the citizen.

Take our own State for example. In the election of 1884, the Republican candidate for Secretary of State had a plurality of 4,383 out of a total vote of 401,003. The Republican majority in the Legislature of 1885 arranged the senatorial districts so that, upon the vote of 1884, 21 were Republican and 11 were Democratic. In eight districts a population of 316,578 are given the same representation in the Senate as are 532,222 people in eight other districts.

The Upper Peninsula, with Emmet and Mackinac counties added, is given three Senators, when it is only entitled to two; the population of the three districts—thirtieth, thirty-first and thirty second—combined being 124,580, and the ratio 61,125. In 1890, the Democratic candidate for Secretary of State received a plurality of 2,706 over the Republican candidate in a total vote of 398,611, and the Democratic majority in the Legislature of 1891 apportioned the senatorial districts so that, on the basis of the vote of 1890, 21 were Democratic and 11 Republican. As shown by Mr. Justice Grant, these districts were so divided that in eight of them a population of 349,156 have the same representation as 695,717 in eight other districts, and, in order to aid this inequality, the county of Saginaw is divided into two districts, when it is only entitled to one under the Constitution. It will thus be seen that, upon a plurality of less than 5,000 in a total vote of about 400,000, each of these political parties has so gerrymandered these senatorial districts that each has 21 senatorial districts to 11 of the other. If permitted to continue in this kind of business, the next Legislature to apportion Senators, if its political complexion should be different from the last, following in the footsteps of its predecessors, will easily change the figures about again, and give its party the 21 Senators and the other the 11. It is time to stop it. And the citizen has the right to appeal to the Court in defense of his most sacred rights under the Constitution. He cannot be obliged to wait for prosecuting attorneys or the Attorney General. It is as well a private as a public grievance, and the individual elector can invoke the aid of the Court in his own behalf, and call attention also to the existence of a great public wrong.

There is no higher privilege granted to the citizen of a free country than the right of equal suffrage, and thereby to an equal representation in the making and administration of the

laws of the land.   Under our State Constitution the right
of the elector is fixed.   To him equal representation is a
right, as well as a privilege, of which the Legislature can-
not deprive him.   These wrongs have been committed for
partisan purposes.   Their object and effect have been to
deprive the majority of the people of their will in the
administration of the government.   The greatest danger to
our free institutions lies to-day in this direction.   By this
system of gerrymandering, if permitted, a political party
may control for years the government, against the wishes,
protests, and votes of a majority of the people of the State,
each Legislature, chosen by such means, perpetuating its
political power by like legislation from one apportionment
to another.

We have been obliged, under the issue here made, to
investigate but two apportionments,—those of 1891 and 1885.
Both are tarred with the same stick.   We do not care to
go further, since there is a remedy in the hands of the
Executive and Legislature.   The consequences of this
decision are not for us.   It is our duty to declare the law,
to point out the invasion of the Constitution, and to
forbid it.

I agree with the result as announced in the opinion of
Mr. Justice GRANT.

McGRATH, J. (concurring).   I desire to express my
hearty concurrence in the views expressed by my brethren.
The purpose of the constitutional enactment is to secure
as nearly as possible equality of representation.   Any
apportionment which defeats that purpose is vicious, con-
trary not only to the letter of the Constitution, but to the
spirit of our institutions, and subversive of popular govern-
ment.   Power secured or perpetuated by unconstitutional
methods is power usurped, and usurpation of power is a
menace to free institutions.   The greatest danger to the

Republic is not from ignorance, but from machinations to defeat the expression of the popular will.

The population of the State, according to the last enumeration made by the authority of the United States, is 2,093,889. The ratio for each Senator is 65,434.

On page 15 will be found a sketch of the division of the Lower Peninsula into senatorial districts by the act of 1891. The population of each county is given, with the total population of each district. The county of Wayne has a population of 257,114, and is divided into four districts. Emmet county is attached in the apportionment to the Upper Peninsula. It will be seen that eight of the districts so formed are populated as follows: 97,330, 91,-420, 88,678, 86,129, 84,694, 82,697, 82,556, 82,213; making a total population of 695,717. Thus but 2,246 less than one-third of the population of the State have but one-fourth of the total number of Senators. Eight other districts have a population of 349,156, and with but a little over $16\frac{1}{2}$ per cent. of the population they have 25 per cent. of the representation in the Senate. Four of the first named have a total population of 363,557, while four of the last named have but 163,215. Any one of the first five named has more than double the population of any one of four of the last named. The first four have a population of 363,557, or 14,401 more than the last named eight, yet the 349,156 persons have eight representatives in the Senate while 363,557 have but four. Why should the twenty-two contiguous counties forming the twenty-seventh, twenty-eighth, and twenty-ninth districts be so divided that five, having a population of but 43,701, are given one Senator, and eight, having a population of but 40,033, are given another, while nine, having a population of 97,330, or 13,596 more than both of the other districts, are given but one? Why should the twenty-eighth or twenty-ninth districts, having, respectively, a population of

43,701 and 40,033, be each allotted one Senator, and St. Clair, with a population of 52,105, be united with Sanilac, so as to make a population of 84,694, or more than both of said districts; or Jackson, with 45,031, be united with Ingham, making a population of 82,697; or Kalamazoo and St. Joseph, with an aggregate population of 64,629, be united with Branch, so as to make a population of 91,420; or Ionia and Eaton, with 64,895, be added to Barry, making a total of 88,678; or Berrien, with 41,285, be united with Cass; or Bay, with 56,412, be united with Gladwin and Arenac; or Muskegon, with its 40,013, be united with Ottawa? Why should Saginaw be divided so as to give two Senators to 82,273 persons, and nine counties be joined —as in the twenty-seventh district—to restrict 97,330 persons to one representative in the Senate; or three be joined, as in the seventh, to restrict 91,420 persons to one; or six be united, as in the thirty-first, to restrict 82,213 to a single Senator; or three be joined, as in the eighteenth, to restrict 86,129 to one Senator; or three, as in the fourteenth, to restrict 88,678; or four, as in the twenty-fifth, to confine 82,556 persons to a single Senator; or why should Bay, with 56,412, or St. Clair, with 52,105, be joined with another county? Any two of the counties in the seventh or fourteenth or twenty-fifth have a population in excess of either of the Saginaw districts, yet in each case those counties are joined.

But the law of 1885 is equally vicious, a similar sketch of the apportionment of which year will be found on page 17. The population of the State was 1,853,658, and the ratio 57,926. Under that apportionment 41 per cent. of the population elected 16 Senators, or half the whole number. Eight districts had a population of 601,468, distributed as follows: 84,600, 78,076, 76,918, 75,047, 74,795, 73,779, 69,246, 69,007. Eight others had 315,925, as follows:

31,617,  32,324,  35,375,  38,454,  38,688,  41,100,  48,783, 49,584.    Sixteen districts had a population of 1,094,687, and the other sixteen had 758,971.    Thirty-three contiguous counties in the Upper Peninsula and the northern part of the Lower Peninsula, with a total population of 275,758, which would entitle them to four Senators, were given seven.    Twenty-seven of these counties, with a population of 176,458, entitling them to three Senators, were accorded five; while Wayne county, with a population of 188,966, was given but three.    St. Clair had a population of 46,783, Calhoun of 41,585, Jackson of 45,232, and Washtenaw of 41,694, or a total of 175,294, yet they were joined with four other counties with a population of 123,993, making a total of 299,287, and the eight counties given four Senators.    The eight counties, averaging 37,410 each, were accorded four Senators, while the five districts, averaging 35,291, were each given one Senator.    The twenty-two counties in the twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth districts, with a population of 151,178, were given four Senators, or one to each 37,794 inhabitants, each lacking over 20,000 of the ratio; and if Lake and Mason had been added they would have been entitled to but three; while St. Clair, Washtenaw, Jackson, and Bay, with 184,930 inhabitants, were practically given but two. Alpena, Oscoda, Alcona, Ogemaw, and Iosco, with less than 56 per cent. of the ratio, were given one Senator, while Bay, with nearly 89 per cent., Jackson, with 77 per cent., St. Clair, with over 80 per cent., and Washtenaw, with nearly 72 per cent., of the ratio, were each joined with another county, and denied the right of sole representation. The eighteen counties in the twenty-sixth, twenty-seventh, and twenty-ninth districts had 102,395 inhabitants, or one ratio and 76 per cent. of a second, and were accorded three representatives in the Senate; while St. Clair, Macomb,

Jackson, Hillsdale, Monroe, and Washtenaw, with 230,041 inhabitants, were accorded but three.

Such laws breed disrespect for all law, for law-makers become law-breakers.