ASBURY PARK PRESS, INC., *ET AL.*, PLAINTIFFS-APPEL-
LANTS, v. J. RUSSELL WOOLLEY, COUNTY CLERK OF
THE COUNTY OF MONMOUTH, *ET AL.*, DEFENDANTS-
RESPONDENTS.

Argued March 22, 1960—Decided June 6, 1960.

2

4

*Mr. William Novogrod* argued the cause for plaintiffs-appellants (*Mr. William Miller,* of counsel and on the brief).

*Mr. Lawrence A. Carton, Jr.,* argued the cause for defendant-respondent, J. Russell Woolley, County Clerk of Monmouth County (*Messrs. Roberts, Pillsbury & Carton,* attorneys; *Mr. William E. Russell,* on the brief).

*Mr. Nicholas T. Fernicola* argued the cause for defendant-respondent, Anthony Giuliano, County Clerk of Essex County (*Mr. George H. Callahan,* of counsel).

*Mr. Jacob Friedland* argued the cause for defendant-respondent, Edward J. Borrone, Hudson County Clerk (*Mr. William F. Kelly, Jr.,* Hudson County Counsel).

*Mr. Theodore I. Botter,* Deputy Attorney General, argued the cause for defendant-respondent, Edward J. Patten, Secretary of State (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

FRANCIS, J.  Plaintiffs are citizens and taxpayers of this State and have their residence in the County of Monmouth. In this action they seek a declaration (1) that the 1941 General Assembly Apportionment Act, *L.* 1941, *c.* 310, *N. J. S. A.* 52:10–1, is violative of *Article IV, Section III, paragraph 1,* of the 1947 *Constitution,* and (2) that the County of Monmouth is entitled to elect three members of the General Assembly rather than the two allotted by the 1941 Act.  The complaint refers to the fact that in every year in which members of the General Assembly are to be elected, the defendant Secretary of State under *N. J. S. A.* 19:12–1 is obliged to direct and cause to be delivered to the clerk of the county and to the county board of elections wherein any such election is to be held, a notice stating that such officers are to be elected.  It is alleged further that upon receipt of the notice the defendant county clerks have the duty, by virtue of *N. J. S. A.* 19:12–3, to cause a copy thereof certified to be true and correct to be delivered to the clerk of each municipality in the county not later than the fiftieth day preceding the primary election for the general election.  By way of ancillary relief, plaintiffs pray for the issuance of an injunction restraining the Secretary of State and the named county clerks from issuing, delivering and acting upon the notice of election.

The trial court dismissed the complaint on the ground that decision as to need for reapportionment as well as the formula to be applied in the event of reapportionment is committed by the *Constitution* exclusively to the legislative branch of the government.  The matter is before us on our own certification.

*Article* IV, *Section* III, *par.* 1, of the 1947 *Constitution* provides, in much the same form as did the *Constitution of* 1844:

"The General Assembly shall be composed of members elected biennially by the legally qualified voters of the counties, respectively, for terms beginning at noon of the second Tuesday in January next following their election and ending at noon of the second Tuesday in January two years thereafter. *The members of the General Assembly shall be apportioned among the several counties as nearly as may be according to the number of their inhabitants, but each county shall at all times be entitled to one member and the whole number of members shall never exceed sixty.* The present apportionment shall continue until the next census of the United States shall have been taken. Apportionment of the members of the General Assembly *shall be made by the Legislature at the first session after the next and every subsequent census,* and each apportionment when made shall remain unaltered until the following census shall have been taken." (Emphasis added.)

Subsequent to the 1940 census and on the basis of the number of inhabitants of each county disclosed thereby, the Legislature, by chapter 310, *L.* 1941, reapportioned the Assembly membership as follows:

| | |
|---|---|
| "Atlantic county, | two members; |
| Bergen county, | six members; |
| Burlington county, | one member; |
| Camden county, | three members; |
| Cape May county, | one member; |
| Cumberland county, | one member; |
| Essex county, | twelve members; |
| Gloucester county, | one member; |
| Hudson county, | nine members; |
| Hunterdon county, | one member; |
| Mercer county, | three members; |
| Middlesex county, | three members; |
| Monmouth county, | two members; |
| Morris county, | two members; |
| Ocean county, | one member; |
| Passaic county, | four members; |
| Salem county, | one member; |

| | |
|---|---|
| Somerset county, | one member; |
| Sussex county, | one member; |
| Union county, | four members; |
| Warren county, | one member." |

The 1950 census of New Jersey was certified by the United States Bureau of the Census on February 5, 1952, and was filed by the Governor with the Secretary of State on February 11, 1952. Despite the revelation from the figures that substantial relative changes in the population of various counties had occurred since 1940, during the succeeding eight years the Legislature failed to heed the Constitutional mandate that the Assembly shall be apportioned "at the first session" after the census. Although many bills have been introduced for the purpose, the 1941 act still controls the number of assemblymen to be elected from each county. As has been indicated, the imperative language of the present *Constitution* appears in substantially the same form as that of 1844, and the parties are in agreement that for the first time in the intervening 100 years there has been a failure to discharge the duty to apportion after each census. See, *New Jersey Legislative Reapportionment* (Nov. 1957), prepared and published by the Law and Legislative Reference Bureau, Division of the State Library, Archives and History.

Plaintiffs do not claim that the 1941 act was invalid at the time of adoption. They contend, however, that the 1950 census shows such a change in the number of inhabitants in the various counties that a different distribution of Assembly seats, some counties being entitled to more and some less than presently specified, is required by the *Constitution*. And they urge that these changes, considered in the light of the Constitutional mandate, have caused the 1941 legislation to become invalid. *Cf. Nashville, C. & St. L. Ry. v. Walters,* 294 *U. S.* 405, 415, 55 *S. Ct.* 486, 79 *L. Ed.* 949 (1935); *Jones v. Freeman,* 193 *Okl.* 554, 146 *P. 2d* 564 (1944), appeal dismissed and *certiorari* denied 322 *U. S.* 717, 64 *S. Ct.* 1288, 88 *L. Ed.* 1558 (1943).

Effectuation of the prescription for allocation of seats among the counties "as nearly as may be" according to the number of their inhabitants, with the maximum number of seats fixed at 60, requires mathematical calculations. If the total population of the State, as shown by the 1950 census, were divided by 60 and the quotient could be divided evenly into the population of each county, the task would be simple. Unfortunately such a perfect result is unlikely, and so the Legislature has the difficult task of distributing whole seats to the extent indicated by the population division (subject to the order of the organic law that each county must have at least one seat) and then allocating the balance in accordance with some treatment of the remaining fractions which will conform with the "as nearly as may be" apportionment mandate.

The record and the briefs indicate that there are five well known modern mathematical formulas which may be used. They are:

1. Method of smallest divisors.
2. Method of the harmonic mean.
3. Method of equal proportions.
4. Method of major fractions.
5. Method of greatest divisors.

*Report of the National Academy of Science to the Speaker of the House of Representatives,* February 4, 1929 (entered in *Congressional Record,* 70th Congress, 2d Session, *Vol. 70, Part 5, pp.* 4966, 4967); *Report Upon the Reapportionment of Representatives by the Advisory Committee to the Director of the Census,* submitted to the Senate Committee on Census, 1921 (entered in *Congressional Record,* 69th Congress, 1st Session, *Vol. 67, Part. 7, pp.* 7078, 7080); *Huntington, Methods of Apportionment in Congress,* 1940 (Senate Document No. 304, 76th Congress, 3d Session, 1940); *Schmeckebier, Congressional Apportionment, The Brookings Institution,* 1941; *Report of Committee on Apportionment of the American Political Science Association,*

1950 (reprinted in *The American Political Science Review, Vol.* 45, *No.* 1, Mar. 1951, *pp.* 153–157); *New Jersey Legislative Reapportionment, supra, pp.* 11–12; and see *Shaw v. Adkins,* 202 *Ark.* 856, 153 *S. W. 2d* 415 (*Sup. Ct.* 1941). Informed students of these formulas speak of some of them as favoring the larger counties or states, while others favor the smaller ones. One formula, the method of equal proportions, seems generally to be regarded as producing the smallest relative differences in population per assemblyman and the smallest relative difference in the individual share in an assemblyman. *Report of the National Academy of Sciences, supra; Huntington, Methods of Apportionment, supra.*

Explanation or illustration of the way these different methods of apportionment operate is not necessary for purposes of this opinion. It is sufficient at this time to point out that if all five tests are applied to the population of the various counties as shown by the 1950 census, the common result is that at least one county is over-represented by a minimum of one too many assemblymen, while another county is under-represented by one too few assemblymen. Indeed, employment of the Vinton and Arithmetical Elimination Process, two other mathematical formulas which have been used in the past in this State and elsewhere, but which do not presently appear to be regarded as efficient as the so-called modern types, produces the same result. Other disparities revealed by all of the tests mentioned likewise derogate from the adequacy of the existing apportionment. All of the evidence disclosed by the record is strongly suggestive of the conclusion that the distribution of Assembly seats prescribed by the 1941 act in the light of the 1950 census no longer satisfies the constitutional command for apportionment among the several counties "as nearly as may be" according to the number of their inhabitants. But in view of the conclusion reached as to the disposition of the case, to be expressed later, actual determination of the issue is reserved for the present.

A principal argument advanced by some of the defendants in opposition to a decision in the matter is that the court has no jurisdiction to entertain the action. Support for the contention is said to reside in *Article* III, *paragraph* 1, of the *Constitution* which divides the government into three distinct branches, legislative, executive and judicial, and specifies that no one branch shall exercise any of the powers properly belonging to either of the others. Therefore, say the defendants, since apportionment of the General Assembly is committed by the *Constitution, Article* IV, *Section* III, *paragraph* 1, to the legislative department, and is essentially a political problem, the complaint presents no justiciable controversy which is within the competence of the Judiciary to decide.

At the outset it must be noted that judicial intervention is not sought by way of *mandamus* to compel the Legislature to apportion conformably to the 1950 census, or to do so by means of any particular formula. As has been indicated, the relief sought is twofold: a declaratory judgment that the 1941 apportionment law is now unconstitutional because of that census, and a restraint which will prevent the holding of a primary or general election for members of the Assembly under that law.

The jurisdictional objection is without merit. It has long been settled in this State that adjudication of problems such as the present one is not only within the ambit of the constitutional authority of the courts, but represents one of their duties as well. *Wilentz v. Stanger,* 129 *N. J. L.* 606 (*E. & A.* 1943); *Botti v. McGovern,* 97 *N. J. L.* 353 (*Sup. Ct.* 1922); *Smith v. Baker,* 73 *N. J. L.* 328 (*Sup. Ct.* 1906), affirmed *per curiam* 74 *N. J. L.* 591 (*E. & A.* 1906); *State v. Wrightson,* 56 *N. J. L.* 126 (*Sup. Ct.* 1893).

The legally qualified voters of the several counties are given the right under the *Constitution* to vote for all officers that are elective by the people. *N. J. Const., Art.* 2, *par.* 3. Assemblymen are such officers, and each voter of each county is entitled to cast his ballot for the number of

them which the absolute mandate of *Article* IV, *Section* III, *supra,* requires to be allocated to his county. Ours is a representative form of government. It can remain such in the true sense only if the vote of each citizen has equality with that of his neighbor in the other counties of the State, according to the prescription of the organic law. To the extent that his county is given a lesser number of members in the lower House than are its due, his vote diminishes in value, and thus he does not receive the full measure of protection and representation which are of the essence of democracy. No man can boast of a higher privilege than the right granted to the citizens of our State and Nation of equal suffrage and thereby to equal representation in the making of the laws of the land. Under our *Constitution* that right is absolute. It is one of which he cannot be deprived, either deliberately or by inaction on the part of a Legislature. Inaction which causes an apportionment act to have unequal and arbitrary effects throughout the State is just as much a denial of equality as if a positive statute had been passed to accomplish the result. In our view, such deprivation not only offends against the *State Constitution* but may very well deny equal protection of the laws in violation of the *Fourteenth Amendment* of the *United States Constitution. Cf. United States v. Raines,* 362 *U. S.* 17, 80 *S. Ct.* 519, 4 *L. Ed. 2d* 524, 532 (Feb. 29, 1960) ; *Brown v. Board of Education of Topeka,* 347 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954) ; *Hague v. Committee for Industrial Organization,* 307 *U. S.* 496, 525–532, 59 *S. Ct.* 954, 83 *L. Ed.* 1423 (1939) ; *Smiley v. Holm,* 285 *U. S.* 355, 52 *S. Ct.* 397, 76 *L. Ed.* 795 (1932) ; *Magraw v. Donovan,* 159 *F. Supp.* 901 (*D. C. Minn.* 1958) ; *Dyer v. Kazuhisa Abe,* 138 *F. Supp.* 220 (*D. C. Hawaii* 1956), reversed on other grounds 256 *F. 2d* 728 (9 *Cir.* 1958). As the Court of Appeals of Kentucky declared in *Stiglitz v. Schardien,* 239 *Ky.* 799, 40 *S. W. 2d* 315, 321 (1931):

"Equality of representation in the legislative bodies of the state is a right preservative of all other rights. The source of the laws

that govern the daily lives of the people, the control of the public purse from which the money of the taxpayers is distributed, and the power to make and measure the levy of taxes, are so essential, all-inclusive, and vital that the consent of the governed ought to be obtained through representatives chosen at equal, free, and fair elections. If the principle of equality is denied, the spirit, purpose, and the very terms of the Constitution are emasculated. The failure to give a county or a district equal representation is not merely a matter of partisan strategy. It rises above any question of party, and reaches the very vitals of democracy itself."

*Colegrove v. Green,* 328 *U. S.* 549, 66 *S. Ct.* 1198, 90 *L. Ed.* 1432 (1946), is not to the contrary, for there no mandatory requirement of a state constitution for apportionment was involved.

█ █ The judicial branch of the government has imposed upon it the obligation of interpreting the *Constitution* and of safeguarding the basic rights granted thereby to the people. In this sphere of activity the courts recognize that they have no power to overturn a law adopted by the Legislature within its constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such case lies with the people. But when legislative action exceeds the boundaries of the authority delegated by the *Constitution,* and transgresses a sacred right guaranteed to a citizen, final decision as to the invalidity of such action must rest exclusively with the courts. It cannot be forgotten that ours is a government of laws and not of men, and that the judicial department has imposed upon it the solemn duty to interpret the laws in the last resort. However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it. *State v. Wrightson, supra,* 56 *N. J. L.,* at *page* 209. The authority and the duty to act when our jurisdiction is invoked in cases like the present, in the words of Chief Justice Beasley in *State v. Rogers,* 56 *N. J. L.* 480, 615 (*Sup. Ct.* 1894), is "so entirely established as not to be debatable." And as the present Chief Justice said in *Village of Ridgefield Park v. Bergen Co. Bd. of Taxation,* 31 *N. J.* 420, 426 (1960), when it is regularly invoked we cannot "properly look the other way."

Recognition of this judicial burden is not peculiar to New Jersey. The responsibility has been accepted in numerous other jurisdictions. See *Magraw v. Donovan, supra; Dyer v. Kazuhisa Abe, supra; Shaw v. Adkins, supra; Armstrong v. Mitten,* 95 *Colo.* 425, 37 *P. 2d* 757 (*Sup. Ct.* 1934); *Moran v. Bowley,* 347 *Ill.* 148, 179 *N. E.* 526 (*Sup. Ct.* 1932); *Brooks v. State,* 162 *Ind.* 568, 70 *N. E.* 980 (*Sup. Ct.* 1904); *Denney v. State,* 144 *Ind.* 503, 42 *N. E.* 929, 31 *L. R. A.* 726 (*Sup. Ct.* 1896); *Parker v. State,* 133 *Ind.* 178, 32 *N. E.* 836, 18 *L. R. A.* 567 (*Sup. Ct.* 1892), rehearing denied 33 *N. E.* 119 (*Sup. Ct.* 1893); *Stiglitz v. Schardien, supra; Ragland v. Anderson,* 125 *Ky.* 141, 100 *S. W.* 865 (*Ct. App.* 1907); *Merrill v. Mitchell,* 257 *Mass.* 184, 153 *N. E.* 562 (*Sup. Jud. Ct.* 1926); *Donovan v. Suffolk County Apportionment Com'rs,* 225 *Mass.* 55, 113 *N. E.* 740, 2 *A. L. R.* 1334 (*Sup. Jud. Ct.* 1916); *Attorney General v. Suffolk County Apportionment Com'rs,* 224 *Mass.* 598, 113 *N. E.* 581 (*Sup. Jud. Ct.* 1916); *Williams v. Secretary of State,* 145 *Mich.* 447, 108 *N. W.* 749 (*Sup. Ct.* 1906); *Board of Sup'rs of County of Houghton v. Blacker,* 92 *Mich.* 638, 52 *N. W.* 951, 16 *L. R. A.* 432 (*Sup. Ct.* 1892); *Giddings v. Blacker,* 93 *Mich.* 1, 52 *N. W.* 944, 16 *L. R. A.* 402 (*Sup. Ct.* 1892); *State ex rel. Barrett v. Hitchcock,* 241 *Mo.* 433, 146 *S. W.* 40 (*Sup. Ct.* 1912); *Rogers v. Morgan,* 127 *Neb.* 456, 256 *N. W.* 1 (*Sup. Ct.* 1934); *In re Sherill,* 188 *N. Y.* 185, 81 *N. E.* 124 (*Ct. App.* 1907); *People ex rel. Baird v. Board of Sup'rs,* 138 *N. Y.* 95, 33 *N. E.* 827, 20 *L. R. A.* 81 (*Ct. App.* 1893); *State ex rel. Lamo v. Cunningham,* 83 *Wis.* 90, 53 *N. W.* 35, 17 *L. R. A.* 145 (*Sup. Ct.* 1892); *State v. Cunningham,* 81 *Wis.* 440, 51 *N. W.* 724, 15 *L. R. A.* 561 (*Sup. Ct.* 1892). And see *Annotation,* 2 *A. L. R.* 1337. In fact, as the Supreme Court of Oklahoma said in *Jones v. Freeman, supra:*

"It might be well to point out that in 1938, the courts of twenty-two states had exercised the power, or had stated that they had the power, to review legislative apportionment acts upon constitutional

grounds, and no court had denied that it possessed such power." 146 *P. 2d,* at *page* 570.

From the foregoing it is manifest that the tri-unity of our government is not invaded by acceptance of this litigation for decision. If by reason of passage of time and changing conditions the reapportionment statute no longer serves its original purpose of securing to the voter the full constitutional value of his franchise, and the legislative branch fails to take appropriate restorative action, the doors of the courts must be open to him. The law-making body cannot by inaction alter the constitutional system under which it has its own existence.

One of the defendants argues that because eight years have elapsed since the 1950 census figures became available, plaintiffs' action ought to be dismissed for laches. The point may be disposed of summarily. Acquiescence for no length of time can legalize a clear violation of duty where the people have plainly expressed their will in the *Constitution* and have appointed judicial tribunals to enforce it. *State v. Wrightson, supra,* 56 *N. J. L.,* at *page* 208. Thus we are brought to the more difficult question of the remedy available to a voter who is denied full representation in the Assembly because an apportionment act has become unconstitutional. Before considering this problem, it seems meet to reassert, as expressive of our own view, the observation of Chief Justice Beasley in *State v. Rogers, supra:*

"It will be understood that in this vindication of what is esteemed to be the undeniable prerogative of this court, there is not the slightest suggestion of the existence of a judicial capacity to control the legislative authority when exercised within its appropriate sphere. * * * All that is asserted is that when the inquiry is whether the legislature, or any other body or officer has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government. Nor can we for a moment forget that, in entering upon the inquiry that is now imposed upon us as a duty, we have to do with a subject of great importance and delicacy, and that, before the restraining power of this court can be exerted to interfere

with the action of a co-ordinate branch of the state government, we must be as certain as care and diligence can make us that the foundation on which we place ourselves is sure and stable.

That this court has the legal right to entertain jurisdiction in the case displayed by this record [*i. e.*, the issue whether the Senate is a continuous body or one to be organized into life annually], we have no doubt, and we are further of opinion that it is scarcely possible to conceive of any crisis in public affairs that would more imperatively than the present one call for the intervention of such judicial authority." 56 *N. J. L.*, at *pages* 616–617.   (Insertion ours.)

Orientated accordingly, we turn to a discussion of possible forms of relief claimed to be open to plaintiffs.

It must be said at once that the courts cannot make the reapportionment themselves.   That duty is legislative in nature and is committed by the *Constitution* to the Legislature.   *Jones v. Freeman, supra.*

There is no doubt, as we have stated, that it is within the competence of the Judiciary to adjudge a reapportionment act violative of the *Constitution*.   Some of the defendants suggest that to do so would be to create chaos or anarchy, because no matter how long the filing of our mandate was withheld to permit the enactment of a curative law, the state government would be completely disrupted if the Legislature did not act within that time.   Although we agree that if the 1941 act has become unconstitutional, resort could not be had to an apportionment act of an earlier vintage because any such measure would also be invalid by the same test, we do not believe that the allegedly feared result would ever come about.   A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an *in terrorem* argument based upon the notion that members of a coequal part of the government will not be just as respectful and regardful of the obligations imposed by their similar oath. Any less faith on our part would be an unbecoming and unwarranted reflection on the Legislature.

Concrete examples of justification for such faith are available.   The two *State v. Cunningham* cases, *supra,* reveal

that on March 22, 1892, the Supreme Court of Wisconsin declared the existing apportionment act invalid. On July 2, 1892 a special legislative session passed a new act. It, too, was invalidated by the same court on October 7, 1892, but ten days later, at a second special session, another reapportionment was adopted, and that act validated the notices of election previously issued by the Secretary of State for the November 8, 1892 election.

In *Magraw v. Donovan, supra,* the Federal District Court declined to accept the contention that reapportionment was not a justiciable issue and convened a three-judge court to hear the merits of the matter. The three-judge court retained jurisdiction pending the 1959 session of the Minnesota Legislature, saying in a *per curiam* opinion:

"Here it is the unmistakable duty of the State Legislature to re-apportion itself periodically in accordance with recent population changes. Minnesota Constitution, *Article 4, Sections* 2 and 23 [M.S.A.]; *Smith v. Holm, supra,* at *page* 490 of 220 *Minn.,* 19 *N. W.* 2d 914; *State ex rel. Meighen v. Weatherill, supra, page* 341 of 125 *Minn.,* 147 *N. W.* 105. Early in January 1959 the 61st Session of the Minnesota Legislature will convene, all of the members of which will be newly elected on November 4th of this year. The facts which have been presented to us will be available to them. It is not to be presumed that the Legislature will refuse to take such action as is necessary to comply with its duty under the State Constitution. We defer decision on all the issues presented (including that of the power of this Court to grant relief), in order to afford the Legislature full opportunity to 'heed the constitutional mandate to redistrict.' *Smith v. Holm, supra,* at *page* 490 of 220 *Minn.,* at *page* 916 of 19 *N. W.* 2d.

*It seems to us that if there is to be a judicial disruption of the present legislative apportionment or of the method or machinery for electing members of the State Legislature, it should not take place unless and until it can be shown that the Legislature meeting in January 1959 has advisedly and deliberately failed and refused to perform its constitutional duty to redistrict the State.*

The Court retains jurisdiction of this case. Following adjournment of the 61st Session of the Minnesota Legislature, the parties may, within 60 days thereafter, petition the Court for such action as they, or any of them, may deem appropriate." 163 *F. Supp.* 184, at *pages* 187–188. (Emphasis added.)

Thereafter, at the 1959 session the Legislature enacted a new apportionment act as a result of which the litigation was dismissed. *Id., 177 F. Supp.* 803 (1959).

In *State v. Wrightson, supra,* a statute which required election of individual assemblymen by districts within the county rather than the total number of them apportioned to the county being elected by all the voters of the county, was declared offensive to the *Constitution.* The judgment was implemented by a *mandamus* directed to the County Clerk of Essex County and to the municipal clerks of the county commanding "that all future elections for members of the general assembly * * * shall be so conducted that such members shall be voted for throughout the county." 56 *N. J. L.,* at *page* 215.

Courts of other jurisdictions have recognized the existence of their authority to issue a *mandamus* to election officials to hold an election for representatives in the Legislature under an earlier apportionment act because the current one was unconstitutional, and to issue an injunction restraining the use of the current one for election purposes, *Parker v. State, supra;* to declare an apportionment act invalid and to enjoin the Secretary of State from expending any public funds in carrying out its provisions, *Armstrong v. Mitten, supra;* to enjoin the clerk of the circuit court, sheriff and auditor of a county from proceeding to hold an election for state senators and representatives under an illegal apportionment law, and to issue a "writ of mandate" to conduct the election under an earlier act, *Denney v. State, supra; Brooks v. State, supra;* to enjoin the holding of a primary election, *Ragland v. Anderson, supra;* to enjoin the county clerk from preparing and furnishing ballots for the approaching primary, *Stiglitz v. Schardien, supra; Rogers v. Morgan, supra;* to grant *mandamus* compelling the Secretary of State to give notice of election of representatives from the county under the earlier act because the later one was void for gerrymandering, *Board of Sup'rs of County of Houghton v. Blacker, supra;* or for improper apportion-

ment, *Giddings v. Blacker, supra, Williams v. Secretary of State, supra;* and to restrain the Secretary of State from conducting an election under an unconstitutional apportionment act, *State v. Cunningham* (two cases), *supra.*

In the present proceeding two further possible remedies have been persuasively suggested. First, that the court may restrain the clerks of the various counties where over or under-representation exists from placing on the ballot at the primary election a clearly excessive or inadequate number of candidates for the Assembly according to the census figures. The second suggestion calls attention to the fact that the *Constitution* provides for a maximum of 60 seats in the Assembly with each county being entitled to at least one seat, but does not regulate the value of the *vote* of each Assemblyman. Plaintiffs then point out that when an apportionment act is invalid the constitutional mandate for allocation of assembly seats as nearly as may be according to the number of inhabitants of each county can be satisfied with mathematical accuracy by means of a court order limiting the value of the *votes* of the assemblymen allocated to a particular county by such act to the exact fraction established by the relation of the population of that county to the population of the State. This formula (without attempting to compute the equation) might indicate, for example, that Essex County with 12 seats according to the 1941 Apportionment Act would be entitled to $10\frac{1}{4}$ votes, each assemblyman being possessed of 1/12th of that number. Establishment of a similar vote value for each county for the total of 60 votes would constitute (it is said) exact representation according to the *Constitution.* And in answer to the possible criticism that some of the partial votes in the counties would be in terms of large fractions, reference is made to the advance in the electronic arts which would permit easy and rapid computation, whatever the fractions might be.

Finally, plaintiffs argue that the phrase "as nearly as may be" requires as a matter of constitutional command

the adoption of the formula for apportionment which comes closest to the mathematical ideal. As a means of describing this ideal, they refer to the statement in the *New Jersey Reapportionment Study, supra, p.* 12, that:

"Since an exact apportionment is not possible [in terms of seats], that method which produces the smallest differences among the counties in population *per* assemblyman (or in individual share in each assemblyman) is the fairest method. If, in any reapportionment, these differences cannot be reduced by shifting one seat from any 1 county to any other county, the seats have been apportioned 'as nearly as may be.'"

They urge that such a method must naturally be the most neutral one, *i. e.,* one which favors neither the larger nor the smaller counties in its application. And they contend that only one formula accomplishes that result, namely, the equal proportions method.

Study of the record has led us to the conclusion that no declaration should be made at this time with respect to the invalidity of the 1941 Apportionment Act or the particular remedy to be made available in the event of such a declaration. Eight years have passed without an attack on the apportionment in the courts. There will be no primary or general election of members of the General Assembly until 1961. The 1960 census has been taken and already some preliminary figures are making their appearance in the public press. Some of the parties have expressed the view that it would be impractical to undertake to reach any kind of a decision related as it would have to be at present to the 1950 census when, in a few months, a reappraisal would be necessary. The indications are that sufficiently reliable preliminary figures will be available in ample time prior to the next primary election. As counsel for one of the defendant counties properly observes, such preliminary statistics have been adjudged adequate for the purpose of meeting the provision for apportionment "as nearly as may be" according to the number of inhabitants of each county. *Cahill v. Leopold,* 141 *Conn.* 1, 103 *A.*

*2d* 818 (*Sup. Ct. Err.* 1954). It may be noted that our *Constitution* requires reapportionment after the "following census shall have been taken." It does not say "taken and promulgated in final form." As the Connecticut Supreme Court of Errors said in the cited case:

"* * * it is not necessary that the information be published in book form before it becomes officially available. Indeed, there is not even a constitutional provision requiring the figures to be final. While final tabulations tend to greater exactitude than those previously computed, there is no need for the precision of perfection. The results of the preliminary counts customarily released by the census bureau, as happened in the case at bar, are ample to afford sufficiently accurate data for an Assembly to proceed to redistrict in an intelligent manner, provided the counts have been broken down into counties, towns and wards." 103 *A.* 2*d*, at *pages* 823–824.

In this connection it is not without significance that at the 1947 Constitutional Convention a proposal to add "and promulgated" after the words "have been taken" of the pertinent clause of *Article* IV was rejected. III *Proceedings, Constitutional Convention of* 1947, *page* 765.

Population estimates of the Department of Conservation and Economic Development seem to plainly indicate that the 1960 census will portray a need for reapportionment of the Assembly more in terms of whole seat variations than did the 1950 figures. *New Jersey Population Estimates* 1958 (*Research Reports No.* 116, March 1959).

Under the circumstances, it is to be presumed that the Legislature contemplates the performance of its constitutional duty to reapportion when the preliminary census results become available. Moreover, our attention has been called to the introduction of bills designed to remove the burdensome task from the Legislature and transfer it to an agency which will not be subjected to the same political pressures in its performance. As Dean Fordham noted in 1957, ten states had adopted that course and in all of them reapportionment had taken place since 1950. *The State Legislative Institution, University of Pennsylvania Press*

(1959), *pp.* 46–47. Three others have followed since then. *Lewis, "Legislative Apportionment and the Federal Courts,"* 71 *Harv. L. Rev.* 1057, 1089 (1958). In some of the states judicial review of apportionment is specifically authorized. See, *e. g., Shaw v. Adkins, supra,* for an excellent court study of the result promulgated by such an independent board. It is worthy of mention also that under *Article* III, *Section* 5, of the *New York Constitution:*

"An apportionment by the legislature, or other body, shall be subject to review by the supreme court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same." 12 *Consolidated Laws Service, p.* 63, 2 *McKinney's Consol. Laws, p.* 621.

For the reasons stated, we shall withhold determination of the various problems presented (except, of course, that of our jurisdiction to hear the matter) in order that the Legislature may have an opportunity to consider adoption of a reapportionment act when the preliminary 1960 census data have been made available by the Federal authorities. In the meantime, the record will be held for the purpose of such further action as the parties deem advisable after such data have become available and within such reasonable time prior to the 1961 primary election as the circumstances may demand.

In the event that reactivation of the proceeding is sought, any additional evidence, and particularly such new computations as appear necessary, may be added to the record by the parties. Additional briefs should also be submitted containing any further arguments the parties desire to present and discussing the following:

(a) Does the language of the *Constitution* requiring apportionment "as nearly as may be" according to the number of inhabitants of each county circumscribe the discretion of the Legislature to the extent that as a matter of law the

formula which is most neutral as between the smaller and larger counties and which, from a mathematical standpoint, most closely approaches the "as nearly as may be" mandate, must be employed?

(b) Are the limits of the "as nearly as may be" test sufficiently broad to permit, in the discretion of the Legislature, adoption of any recognized mathematical formula for apportionment, regardless of whether it in some measure favors the small over the large counties or *vice versa?*

(c) If reapportionment is not accomplished legislatively after the 1960 census figures become available (and assuming that (a) above is not applicable), does the court have the constitutional authority

1) to allow the present allocation of assemblymen to the various counties to stand but to limit the value of their vote by counties according to the 1960 census? In this event, does the *Constitution* by implication preserve one vote as well as one seat to the counties which, on a population basis, would not be entitled to one seat?

2) to enjoin the election of the number of assemblymen in any county who palpably appear to constitute over-representation by reason of the 1960 census?

3) to order the inclusion on the ballot of such additional assemblymen as any county palpably appears entitled to under the mandate of the *Constitution* by reason of the 1960 census?

Jurisdiction of the cause is retained and decision on the merits is withheld for the purposes outlined. An appropriate order may be entered.

PROCTOR, J. (concurring). I agree with the views expressed in the majority opinion that the voters' constitutional right to equal representation in the General Assembly is violated when the Legislature, despite significant population shifts among the several counties of the State, fails to reapportion its membership after a census. I also agree that although, as stated in the majority opinion, it is now

obvious under any recognized formula that "at least one county is over-represented by a minimum of one too many assemblymen, while another county is under-represented by one too few assemblymen," this appeal should be held, because the time has passed for appropriate judicial action with regard to members of the General Assembly already elected. Judicial action at this time would be inappropriate, and I think that, in light of the views expressed today by this court, the Legislature should be afforded an opportunity to heed the constitutional mandate to reapportion. But I feel that I should make clear the course of action I would take in the event the Legislature does not act to reapportion in accordance with the constitutional mandate a reasonable time before the 1961 primary election for the members of the General Assembly. If the Legislature fails to act by that time I would entertain an application to enjoin the Secretary of State and the clerk of any county which is palpably over-represented in the General Assembly to notify the board of elections of such county that there is to be elected only such number of assemblymen as the county is constitutionally entitled to. I would also entertain an application to enjoin the Secretary of State and the clerk of any county that is palpably under-represented to notify the board of elections of such county that there is to be elected the full number of assemblymen as the population of such county clearly requires. Of course, if at that time some other equally effective method of enforcing the constitutional mandate is suggested, I would also consider it.

The majority opinion stresses the point that the 1960 census figures may soon be available to the Legislature. At this time I have no way of knowing whether the Legislature will have these figures in time for action on its part affecting the 1961 election. But, whether or not it has them, if it fails to act I think the court must, upon a proper and seasonable showing, issue its mandate in vindication of the right of equal representation secured by the *Constitution*.

I am authorized to say that Justice Schettino joins in this concurring opinion.

Proctor and Schettino, JJ., concurring in result.

*To hold*—Chief Justice Weintraub, and Justices Burling, Jacobs, Francis, Proctor, Hall and Schettino—7.

*Opposed*—None.