Bruce L. STOUT et al., Plaintiffs,

v.

John D. BOTTORFF, Secretary of State of the State of Indiana, et al., Defendants.

Nelson GRILLS, Plaintiff,

v.

Roger D. BRANIGIN, Governor of Indiana, et al., as members of the State Election Board, Defendants.

Nos. 61C236, 62C326.

United States District Court
S. D. Indiana,
Indianapolis Division.

Dec. 16, 1965.

See also, 246 F.Supp. 825.

Robert D. Risch and Jerome Strauss, John Wood, William D. Ruckelshaus, Frank E. Spencer, Indianapolis, Ind., for plaintiffs Bruce L. Stout et al.

John J. Dillon, Atty. Gen. of Indiana, Indianapolis, Ind., for defendants John D. Bottorff et al.

Nelson Grills, pro se.

John J. Dillon, Atty. Gen. of Indiana, Indianapolis, Ind., for defendants Roger D. Branigin et al.

Before KILEY, Circuit Judge, and STECKLER and GRANT, Chief Judges.

PER CURIAM.

On September 20, 1965, after declaring unconstitutional Chapter 230, Acts of 1965, enacted by the 94th Indiana General Assembly at its Regular Session, this court set December 1, 1965, as the "cut-off date" by which the General Assembly might enact a constitutional reapportionment of the State of Indiana. In response to this court's decision, the Second Special Session was convened on October 18, 1965. The Attorney General of the State of Indiana, on the 3rd day of November, 1965, on behalf of the defendants and the people, filed Senate Enrolled Acts 464, 473, 469, and 474, and House Enrolled Acts 1678, 1680, 1681, and 1683, to which we shall, as the parties do, refer in this opinion respectively as Senate Plans A, B, C, and D, and House Plans A, B, C, and D. Except for both Plans A, each Plan contains a statement that it is "the understanding and intent" of the General Assembly that that Plan is to be void if the prior Plan is constitutional. Thereafter, the several plaintiffs filed "Objections" to the various plans. Having considered Senate Plans A and B, and House Plans A, B, and C, and the objections thereto, we decide that Senate Plan A is unconstitutional; that House

Plan A and House Plan B are unconstitutional; and that Senate Plan B and House Plan C are constitutional.

## I.

The court has selected, from Senate Plan A, six instances or combinations representing twelve of the thirty-two senatorial districts, in which there are overall deviations in excess of 20%[1] from the ideal senate ratio of one senator per voting population of 55,558.[2] The greatest deviation above the ideal senate ratio is 15.57% in District 25 (Grant and Wabash Counties), and the greatest deviation below the ideal is 15.46% in District 18 (Fayette, Rush, and Shelby Counties). Thus a vote in District 25 is diluted by more than 31% from a vote in District 18. The other five instances of overall deviation range from 28.90% down to 20.27%.

The court finds there is no sufficient justification shown for these "significant departures" from apportionment on a population basis, and that approval, express or implied, of Senate Plan A by some plaintiffs cannot justify the deviations. In these six instances the deviations are impermissible as rendering voting rights substantially unequal under federal standards of constitutionality as set forth in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

The court further finds that the provisions of Senate Plan B, discussed immediately hereinafter, are the best evidence that the deviations result from districts constructed in Senate Plan A

[1]. On October 16, 1965, two days before the Second Special Session of the Indiana General Assembly began on October 18, 1965, this court conducted a pretrial conference at which all parties hereto were represented. As a result of said conference, on October 20, this court notified the parties that deviations in excess of 10% above or 10% below the ideal, or an overall 20%, "could endanger any apportionment plan constitutionally." Thereafter, Senate Enrolled Act 464, Senate Plan A, was adopted and approved on October 27, 1965.

[2]. The ratio is the result of dividing the total voting population of Indiana by fifty, the number of senators provided for in both Senate Plans A and B. The instances are selected by taking, in descending order, combinations of the greatest deviations above and the greatest deviations below the ideal senate district down to the point where the combinations ceased to exceed an overall deviation of 20%. The combinations selected for Senate Plan A are as follows:

1. District 25 (Grant and Wabash Counties) is 15.57% above the ideal and District 18 (Fayette, Rush, and Shelby Counties) is 15.46% below the ideal, resulting in an overall deviation of 31.03%.

2. District 26 (Howard and Miami Counties) is 13.48% above the ideal and District 14 (Jackson, Jennings, Scott, and Washington Counties) is 15.42% below the ideal, resulting in an overall deviation of 28.90%.

3. District 4 (Fountain and Tippecanoe Counties) is 13.43% above the ideal and District 10 (Dubois, Pike, Spencer, and Warrick Counties) is 14.77% below the ideal, resulting in an overall deviation of 28.20%.

4. District 30 (Elkhart County) is 12.76% above the ideal and District 23 (Delaware, Jay, and Randolph Counties) is 13.24% below the ideal, resulting in an overall deviation of 26.00%.

5. District 31 (Kosciusko, LaGrange, Noble, and Steuben Counties) is 9.67% above the ideal and District 6 (Clay, Sullivan, and Vigo Counties) is 11.90% below the ideal, resulting in an overall deviation of 21.57%.

6. District 19 (Marion County) is 9.04% above the ideal and District 20 (Union and Wayne Counties) is 11.23% below the ideal, resulting in an overall deviation of 20.27%.

In this Plan, as in the others discussed hereafter (except House Plan C), it is possible to form different combinations of these and other districts, which contain a greater number of "instances" of district-pairings exceeding a 20% overall deviation than those selected by the court. However, the method of combining districts used herein selects the pairs of districts which illustrate the greatest dilution of voting rights, and we deem it unnecessary to consider other combinations of districts which would illustrate a greater number of instances exceeding 20% but in which a less odious dilution of voting rights is shown.

which are not "as nearly of equal population as is practicable," Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1390, and the deviations are unjustified because unnecessary.

## II.

The court selects, from Senate Plan B, in the same manner used in passing on Senate Plan A, two instances wherein the sum of the extreme deviations above and below the ideal senate ratio results in overall deviations in excess of 20%. In District 5 (Elkhart County) the deviation is 12.77% above the ideal, and in District 20 (Wayne and Union Counties) the deviation is 11.22% below the ideal. The spread between the extremes is an overall deviation of 23.99%, and a corresponding dilution of voting strength in District 5. In District 28 (Jackson, Lawrence, Orange, and Washington Counties) the deviation is 10.89% above the ideal, and in District 18 (Hendricks, Owen, and Morgan Counties) the deviation is 10.61% below the ideal. The result here is an overall deviation of 21.50%, and a corresponding dilution of voting strength in District 28.

Under Senate Plan B, the ratio of the district with the largest population per senator to the smallest such district is 1.27 to 1, as compared with the ratio of 1.37 to 1 in Senate Plan A. The minimum percentage of total voting population residing in districts which could elect a majority of the senators under Senate Plan B is 49.46%. Under Senate Plan A, the percentage is 48.29%.

■ It is our opinion that Senate Plan B does not offend against the Equal Protection Clause of the Fourteenth Amendment and meets the federal standards. As we have pointed out, Senate Plan B in only two instances deviates significantly from the ideal, and in those instances exceeds but little the 20% danger line announced by this court. We think the result is a "substantial equality" in the voting rights among voters in all districts, apportioned on the population basis required by Reynolds v. Sims, supra.

In view of our conclusion that Senate Plan B meets federal standards of constitutionality, we need not and do not consider Senate Plans C and D.

## III.

The court has selected, from House Plan A, seven instances of deviation above and below the ideal House ratio of one representative per voting population of 27,779, that constitute unjustifiable, impermissible deviations.[3] The devia-

---

3. The House ratio is the result of dividing the total voting population of Indiana by one hundred, the number of representatives provided for in House Plans A, B and C. These instances are selected in the same manner as those selected in our consideration of Senate Plan A (see Footnote 1, supra) and are as follows:

1. District 18 (Huntington and Wells Counties) is 19.92% above the ideal and District 42 (Warrick and Spencer Counties) is 15.02% below the ideal, resulting in an overall deviation of 34.94%.

2. District 30 (Hamilton and Tipton Counties) is 18.86% above the ideal and District 40 (Pike and Dubois Counties) is 14.53% below the ideal, resulting in an overall deviation of 33.39%.

3. District 27 (Shelby and Decatur Counties) is 16.42% above the ideal and District 26 (Fayette and Franklin Counties) is 14.06% below the ideal, resulting in an overall deviation of 30.48%.

4. District 47 (Ripley and Dearborn Counties) is 14.60% above the ideal and District 8 (Kosciusko County) is 12.91% below the ideal, resulting in an overall deviation of 27.51%.

5. District 13 (Wabash and Whitley Counties) is 13.90% above the ideal and District 24 (Wayne and Union Counties) is 11.23% below the ideal, resulting in an overall deviation of 25.13%.

6. District 12 (Miami and Howard Counties) is 13.48% above the ideal and District 34 (Johnson County) is 9.80% below the ideal, resulting in an overall deviation of 23.28%.

7. District 5 (Elkhart County) is 12.76% above the ideal and District 21 (Madison County) is 8.85% below the ideal, resulting in an overall deviation of 21.61%.

tion extremes are in District 18 (Huntington and Wells Counties), where the deviation is 19.92% above the ideal, and in District 42, where the deviation is 15.02% below the ideal. The spread between these extremes is an overall deviation of 34.94%. This dilutes the vote of a voter in District 18 almost 35% from that of a voter in District 42. The overall deviations in the other six instances selected by the court range from 33.39% down to 21.61%, and constitute corresponding dilutions in voting strength in the districts involved.

The court finds there is no justification shown for these "significant departures" from the ideal house ratio. Approval of House Plan A by the parties, express or implied, cannot justify the deviations. The court finds the deviations in these seven instances show the impermissible dilution of voting rights under the federal standard of "substantial equality" of population. House Plan A is unconstitutional.

## IV.

The court has selected, from House Plan B, thirteen instances of deviation above and below the ideal house ratio that constitute excessive and unjustifiable deviations.[4] The deviation extremes are 31.18% above the ideal house ratio in District 29 (Boone and Montgomery Counties), and 19.97% below the ideal in District 43 (Lawrence County). The overall deviation between these extremes is 51.15%. This dilutes the vote of a voter in District 29 more than 51% from that of a voter in District 43. The overall deviations in the other twelve instances range from 48.14% down to 22.56%.

4. These instances are selected in the same manner as those selected in our consideration of Senate Plan A (see Footnote 1, supra) and are as follows:

1. District 29 (Boone and Montgomery Counties) is 31.18% above the ideal and District 43 (Lawrence County) is 19.97% below the ideal, resulting in an overall deviation of 51.15%.

2. District 51 (Clark County) is 28.36% above the ideal and District 41 (Brown and Jackson Counties) is 19.78% below the ideal, resulting in an overall deviation of 48.14%.

3. District 42 (Monroe County) is 25.53% above the ideal and District 39 (Ripley and Jennings Counties) is 19.67% below the ideal, resulting in an overall deviation of 43.20%.

4. District 2 (Porter County) is 21.29% above the ideal and District 32 (Vigo County) is 18.22% below the ideal, resulting in an overall deviation of 39.51%.

5. District 16 (Huntington and Wells Counties) is 19.92% above the ideal and District 50 (Jefferson and Scott Counties) is 17.24% below the ideal, resulting in an overall deviation of 37.16%.

6. District 44 (Greene and Daviess Counties) is 18.93% above the ideal and District 28 (Hendricks County) is 16.11% below the ideal, resulting in an overall deviation of 35.04%.

7. District 21 (Tipton and Hamilton Counties) is 18.86% above the ideal and District 54 (Warrick and Spencer Counties) is 15.02% below the ideal, resulting in an overall deviation of 33.88%.

8. District 23 (Delaware County) is 16.87% above the ideal and District 48 (Pike and Dubois Counties) is 14.53% below the ideal, resulting in an overall deviation of 31.40%.

9. District 36 (Shelby and Decatur Counties) is 16.42% above the ideal and District 38 (Dearborn, Ohio, and Switzerland Counties) is 13.92% below the ideal, resulting in an overall deviation of 30.34%.

10. District 9 (Wabash and Whitley Counties) is 13.91% above the ideal and District 12 (Newton, Jasper, and Benton Counties) is 13.60% below the ideal, resulting in an overall deviation of 27.51%.

11. District 25 (Randolph and Wayne Counties) is 13.50% above the ideal and District 31 (Parke and Putnam Counties) is 13.33% below the ideal, resulting in an overall deviation of 26.83%.

12. District 15 (Howard and Miami Counties) is 13.48% above the ideal and District 10 (Kosciusko County) is 12.90% below the ideal, resulting in an overall deviation of 26.38%.

13. District 5 (Elkhart County) is 12.77% above the ideal and District 35 (Johnson County) is 9.79% below the ideal, resulting in an overall deviation of 22.56%.

The court finds that there is no justification shown for these "significant departures" from the ideal house ratio. And, as we have noted with respect to other plans, approval of House Plan B by the parties, express or implied, cannot justify the deviations. In these thirteen instances the deviations show the impermissible dilution of voting rights under the federal standard requiring "substantial equality" of population. House Plan B is unconstitutional.

### V.

We think House Plan C meets the federal standards of constitutionality. In this Plan, there is but one instance of the extreme deviations above and below the ideal house ratio of 27,779, resulting in an overall deviation in excess of 20%. In District 22 (Randolph and Wayne Counties) the deviation is 13.50% above the ideal, and in District 17 (Howard and Tipton Counties) the deviation is 10.01% below the ideal. The overall deviation between these extremes is 23.51%. Thus a vote in District 22 is diluted 23.51% from a vote in District 17.

Under House Plan C, therefore, the ratio of the district with the largest population per representative to the smallest such district is 1.26 to 1, as compared with a like ratio of 1.41 to 1 in House Plan A and 1.64 to 1 in House Plan B. The minimum percentage of total voting population residing in districts which could elect a majority of the House of Representatives under House Plan C is 48.72%, as compared with a like percentage of 48.29% in House Plan A and 46.93% in House Plan B.

■ House Plan C in our opinion clearly meets federal constitutional standards of "substantial equality" in the voting rights among voters in all districts, apportioned on the population

basis required by Reynolds v. Sims, supra. As in Senate Plan B, where we found only two instances of significant overall deviations from the senate ideal, in House Plan C we find only one such deviation from the house ideal, and this one too is but slightly in excess of the 20% danger line previously mentioned.

Since we find and conclude that House Plan C meets federal constitutional standards, we need not and do not consider House Plan D.

### VI.

Thus the General Assembly has, in Senate Plan B and House Plan C, provided substantially equal state legislative representation for all voters in Indiana regardless of where they reside. Reynolds v. Sims, supra. We think the General Assembly has made an honest and good faith effort to reapportion both houses of Indiana's bicameral legislature into districts of substantially equal population "as nearly as practicable"; that it has evidently applied in Senate Plan B and House Plan C the "overriding objective" of attaining "substantial equality of population among the various districts," and has not in the districts "significantly departed" from that basic standard; and has thus met the federal requirements stated in Reynolds v. Sims, supra.

The General Assembly has adhered, as closely as practicable, to this court's statement in its September 20, 1965 opinion that the General Assembly "must, if possible, steer a course safely within the requirements of both" the United States Constitution and the Indiana Constitution, the latter being considered both in itself and as interpreted by the Indiana Supreme Court in Denney v. State ex rel. Basler, 144 Ind. 503, 42 N.E. 929, 31 L.R.A. 726 (1896).[5]

---

5. In regard to Sections 5 and 6 of Article 4 of the Indiana Constitution, the court in Denney, 144 Ind. at 520, 42 N.E. at 934, stated:

> To secure the fullest possible local county representation with the nearest proportionate representation of the

voters in each county is the approximate result to be reached from these two requirements of the constitution. Either of these objects—county representation, or proportionate popular representation—might be attained in perfection, were it not for the necessity of

With respect to the requirements of Indiana law: Under Senate Plan B and House Plan C the counties are contiguous;[6] no county has been divided for senatorial districts;[7] and each county with a ratio is represented by a member of the legislature.[8] Wherever practicable, the General Assembly avoided grouping one county with less than a ratio in a district with other counties to give the former a voice in electing more than one member;[9] and wherever practicable it has avoided forming districts containing large fractions unrepresented while providing overrepresentation for other districts.[10]

We think that the foregoing relation of Senate Plan B and House Plan C to the federal and state standards shows a harmonious accommodation of both in solving a difficult problem.

## VII.

Subsequent to the filing of the several acts adopted by the General Assembly in the Second Special Session, the question has been raised as to the constitutionality of Section 4 of Senate Plan B. The question of course could not have been raised in the pleadings prior to the adoption of Senate Plan B.

Section 4 of Senate Plan B reads:

"The senators elected in the general election of 1964 for full 4-year terms shall continue to hold office until the terms for which they were elected have expired by limitation."

This same provision appeared in Senate Plans A, C, and D.

■ We find Section 4 of Senate Enrolled Act 473, Senate Plan B, thus providing for the holding over of all senators elected in 1964 for their full four-year terms, not to be severable from the rest of the Act. This is so for the reason that Section 3 of the Act, which constructs the districts and assigns the number of senators to each district, provides for the election in some districts in 1966 of less than the number of senators assigned, because of Section 4. Thus, Section 4 and Section 3 are so interwoven as to be inseparable under Indiana law. Ettinger v. Studevent, 219 Ind. 406, 38 N.E.2d 1000 (1942); Keane v. Remy, 201 Ind. 286, 168 N.E. 10 (1929).

The transition from the unconstitutional 1963 Act to the valid apportionment established in Senate Plan B is inequitable in so far as voters in certain counties[11] in new valid districts will be represented in the Indiana Senate solely

---

also attending to the other object; but the design was that neither be neglected or sacrificed for the other.

6. Indiana Constitution, art. 4, § 6 (1881).

7. Indiana Constitution, art. 4, § 6 (1881).

8. Denney v. State ex rel. Basler, 144 Ind. 503, 530, 42 N.E. 929, 937 (1896).

9. In Denney, the Indiana Supreme Court said:
"* * * [I]n no case can a county having less than the ratio be so grouped with other counties as to have a voice in the election of more than one member of the general assembly." 144 Ind. at 531, 42 N.E. at 937.
In Senate Plan B this rule was disregarded in six of that Plan's thirty-one districts (viz., Districts 4, 7, 14, 15, 23, and 26.) In House Plan C the rule was disregarded in seventeen of that Plan's thirty-nine districts (viz., Districts 2, 5, 9, 12, 16, 17, 18, 20, 22, 23, 25, 29, 30, 31, 32, 33, and 37).

Unfortunately, the good faith effort of the General Assembly to comply with federal constitutional standards necessitated twenty-three departures from this rule of the Denney case. However, by virtue of the Supremacy Clause, the requirements of the United States Constitution must prevail over those of the State if a conflict arises. Anticipating this eventuality, this court, in its opinion of September 20, 1965, stated that the General Assembly must, if necessary, and to the extent necessary, disregard the limitations of the Indiana Constitution as interpreted in the Denney case to achieve the aim of meeting the federal constitutional standards.

10. Denney v. State ex rel. Basler, 144 Ind. 503, 531, 42 N.E. 929, 938 (1896).

11. These counties are: Noble, Owen, Starke, Kosciusko, Pulaski, Miami, Benton, Warren, Decatur, Lawrence, and Orange.

by holdover senators in whose election they did not participate. In these eleven of the ninety-two Indiana counties, inequities result from suspending the opportunity of the voters thereof to participate in the election of senators until 1968. In the interim they will be represented by senators in the election of whom they had no voice.[12]

The question is, therefore, whether these inequities should invalidate Senate Plan B, the senatorial districts of which we find to have been apportioned constitutionally.

Several considerations guide us in this matter: If possible, we should sustain the provision of the Indiana Constitution, met in Senate Plan B, requiring staggered terms of senators. We should not obtrude ourselves unnecessarily into the legislative domain. We cannot now undo the injustices done Owen and Noble County voters in the suspension of their opportunity to participate in the election of a senator under the unconstitutional 1963 Reapportionment Act. We should favor an orderly transition from that unconstitutional act to the constitutional reapportionment scheme now approved by us. Inequity to some degree to some voters in reapportionment is generally unavoidable.

The foregoing considerations, viewed in the light of our conclusion that the "overriding objective" of substantial equality of population per senator has been met in Senate Plan B, lead us to conclude that we should not reject that Plan as unconstitutional—only because of the existence in the holdover provisions of temporary inequities that will end in 1968—after the long history of legislative neglect to reapportion and the unsuccessful legislative attempts in achieving conformity with federal constitutional standards.[13] The plan is not perfect, and we cannot approve the temporary inequities. However, perfection in human affairs is rarely attained, and the Equal Protection Clause of the Fourteenth Amendment does not contemplate perfection. We therefore conclude that the objections levelled against the holdover senator provision embodied in Section 4 of Senate Plan B should be, and are, hereby, overruled.

## VIII.

We declare that Senate Enrolled Act 464, Senate Plan A, and House Enrolled Acts 1678 and 1680, House Plans A and B respectively, are unconstitutional; and that Senate Enrolled Act 473, Senate Plan B, and House Enrolled Act 1681, House Plan C, are constitutional. The defendants will be ordered to prepare for, and conduct, the 1966 election for Indiana's General Assembly in accordance with the provisions of Senate Enrolled Act 473 and House Enrolled Act 1681.

12. In Noble and Owen Counties the voters have not participated in the election of a senator since 1960. They were skipped in 1964 and in normal course will vote for a senator in 1968, as they are entitled to do under Senate Plan B. However, from 1966 to 1968 they will not have had a voice in the election of the respective senators who will represent them during that period. In the other nine counties, the voters have not participated in the election of a senator since 1962. They will not vote in the 1966 senatorial election, being represented in 1966–68 by a holdover senator elected in 1964 by voters of other counties which now comprise part of the new district, but they will vote in the election of a senator in the 1968 elections, under Senate Plan B.

These inequities, therefore, are temporary, and will be completely removed when, in 1968, the voters of these eleven counties do participate in the election of a senator of their own choice, under Senate Plan B. Of course, the voters in these counties will participate in the 1966 House elections, as they have done in all previous House elections.

13. From 1921 until 1963, no reapportionment was made by the General Assembly; in November, 1963, this court struck down the 1921 Acts, see Stout v. Hendricks, 228 F.Supp. 568 (S.D.Ind.1963). The Reapportionment Act of 1963 was held unconstitutional by this court in our Entry of February 26, 1965. A subsequently enacted 1965 Act was held to be unconstitutional by this court in our Entry of September 20, 1965, see Stout v. Bottorff, 246 F.Supp. 825 (S.D.Ind. 1965).